**In re Lloyd J. DREILING, Debtor.**

**Kearns Motor Company, Inc., dba Denver Jeep Eagle; Robert Liley; Michelle Liley; Michael Absher; Judy Absher; and Kathleen Dreiling, Plaintiffs,**

**v.**

**John A. Cimino, Trustee, Defendant and Third–Party Plaintiff,**

**v.**

**Lloyd J. Dreiling, Third–Party Defendant.**

**Bankruptcy No. 89 B 14175 A.
Adversary No. 97–1357 RJB.**

United States Bankruptcy Court,
D. Colorado.

April 7, 1999.

J. Matthew DePetro, Englewood, Colorado, for plaintiffs.

Darrell M. Daley, Robert S. Anderson, of Chrisman, Bynum & Johnson, P.C., Boulder, Colorado, and Daniel F. Lynch, Denver, Colorado, for the defendant/trustee.

Eldon E. Silverman, of Preeo, Silverman & Green, P.C., Denver, Colorado, for Third Party defendant/debtor.

## MEMORANDUM OPINION AND ORDER

ROLAND J. BRUMBAUGH, Bankruptcy Judge.

THIS MATTER came on for trial on the Plaintiffs' Complaint and the Defendant Chapter 7 Trustee's Counterclaims and Third Party Complaint. The trial was held on November 2, 3, 4, 9, and 25, 1998.[1]

Although this Adversary was commenced June 2, 1997, much of the relevant events took place years ago. In order to have a complete understanding, one must go back to 1960.[2] On or about December 19, 1960, Jack Kearns Motor Co. ("Kearns") was incorporated as a Jeep franchise and was later made a Jeep/Eagle/Chrysler dealership at 3247 South Broadway, Englewood, Colorado. (Plaintiff's Ex. B, C; Direct Testimony of Debtor in Adversary No. 92–2174 PAC, 4/1/94.) The Articles of Incorporation (Plaintiff's Ex. B) provide, *inter alia*, that "Shareholders of the company shall have full preemptive rights."

The By–Laws (Plaintiff's Ex. C) specify at Article IV, § 5, certain restrictions on the sale of stock by shareholders. That

1. This Court ordered that if there were no written objections to exhibits filed by a date certain, all exhibits would be admitted for all purposes. Plaintiffs offered Exhibits A through RRRRR and TTTTT. Defendant Chapter 7 Trustee offered Exhibits 1 through 280, 298, 299, 300, 301, and 302. Either in accordance with the Court's Order, or during the trial, all of these exhibits were admitted EXCEPT the following Plaintiff Exhibits: A, U, X, Y, Z, AA through HH, KKK, LLL, PPP, QQQ, AAAA, EEEE, LLLL, QQQQ, RRRR, TTTT, IIIII, RRRRR, TTTTT (KK and LL were admitted, not for the truth of the matters therein, but only to show they were received by Chrysler around January 1990); and EXCEPT the following Defendant Exhibits: 7 through 12, 60, 77, 79 through 86, 95 through 98, 277, and 302 (Exhibits 298 through 301 were admitted for impeachment purposes only).

2. During the trial the Court indicated that it would take judicial notice of all of its own files and gave the parties the opportunity to supply copies of any specific documents they wanted to bring to the Court's attention, which they did. However, none of the parties presented a particularly coherent case at trial, apparently assuming the Court already knew the relevant background and facts. Therefore, the Court has undertaken to review each and every document in each of its files concerning these parties. Specific reference will be made to the documents and files which the Court has used to put together the particularly confused mosaic involved herein. Specifically, the Court reviewed the following case files: *In re L.J. Dreiling Motor Co., Inc.,* Case No. 86 B 12075 J; *In re Steven Joseph Dreiling,* Case No. 91–19282 DEC; *In re Dorothy Elaine Dreiling,* Case No. 91–24052 SBB; and *In re Lloyd J. Dreiling,* Case No. 89 B 14175 A; and the following adversary proceeding files: *E. Dreiling Investments Company v. Lloyd J. Dreiling,* Adversary No. 90 A. 0033; *Union Bank & Trust v. Lloyd J. Dreiling,* Adversary No. 90 A. 0413; *Associates Commercial Corporation v. Steven J. Dreiling,* Adversary No. 91–1816 CEM; *Albert Hoffman, Trustee v. Steven J. & Patricia A. Dreiling, et al.,* Adversary No. 92–1396 RJB; *John A. Cimino, Trustee v. Lloyd J. Dreiling, et al.,* Adversary No. 92–2174 PAC, *Jeffrey A. Weinman, Trustee v. Kearns Motor Company a/k/a Denver Jeep Eagle, et al.,* Adversary No. 93–1345 RJB, and, of course, the within adversary proceeding file, Adversary No. 97–1357 RJB. Unless a specific file is noted, any reference to exhibits means those exhibits that were admitted in the within adversary proceeding, and any facts recited that do not have a specific reference came from the testimony at trial herein.

Article specifies that before a shareholder can sell his shares, he must first offer such stock to the other shareholders. In addition, Article IV, § 5, ¶ (i) provides as follows (hereinafter referred to as a "stock transfer restriction"):

All stock Certificates of the corporation issued and delivered to its shareholders shall have endorsed thereon the following statement: "The shares of stock represented by this Certificate are non-negotiable and non-assignable except in conformity with Article IV of the By-Laws which restricts sale and transfer and prohibits encumbrance of the shares."

In 1966 L.J. Dreiling Motor Co. ("LJDM") was incorporated by the Debtor as a Navistar franchise dealer. (Direct Testimony of Debtor in Adversary No. 92–2174 PAC, 4/1/94.)

On May 2, 1969, Lloyd J. Dreiling ("Debtor"[3]) purchased 29,998 of the outstanding 30,000 shares of Kearns (Plaintiff's Ex. D), and stock Certificate No. 4 was issued to the Debtor with the appropriate stock transfer restriction noted on the face. One share (Certificate No. 5) was issued to Debtor's wife, Dorothy E. Dreiling ("Dorothy") and one share (Certificate No. 6) was issued to Robert D. Billington, Jr. Both of these certificates bore the appropriate restriction. However, these two certificates were marked canceled and no explanation was given for these cancellations.

On the advice of John T. Kearns, an attorney and son of Jack Kearns, the Debtor on or about September 8, 1969, made a self-settled revocable trust, the Lloyd J. Dreiling Trust ("Trust"). (Plaintiff's Ex. RRR; direct Testimony of Debtor in Adversary No. 92–2174 PAC, 4/1/94.) The Debtor then transferred his 29,998 shares of Kearns to himself and his wife as trustees of the Trust, and Certificate No. 7 was issued December 1, 1969, reflecting the new owners. There was no copy of Certificate No. 7 presented so the Court does not know if there was any restriction placed on the face of this certificate. (Plaintiff's Ex. D.)

In addition to the Kearns stock, the Debtor placed the stock he owned in LJDM and certain life insurance policies into the Trust. LJDM stock was thus held 80% by the Trust and 20% by the Debtor's son, Steven Dreiling ("Steven"). (Direct Testimony of Debtor in Adversary No. 92–2174 PAC, 4/1/94.)

The Debtor spent most of his time in the operation of LJDM but did remain involved in the operations of Kearns. Robert Liley ("Rob"), son-in-law of the Debtor and Vice President of Kearns, was conducting most of the day-to-day business of Kearns. The Debtor was also spending a lot of time running the business of Bill Dreiling Buick for the family of his deceased brother.

On October 31, 1971, Kearns issued an additional 10,000 new shares (Certificate No. 8) to the Debtor and his wife as trustees for the Trust in exchange for $10,000 from the Debtor. Certificate No. 8 had the appropriate restriction noted on its face. (Plaintiff's Ex. D.)

On June 8, 1973, the Debtor incorporated Dekmas Leasing Company ("Dekmas"). Later that same month the corporate name was changed to Import Jobbers Warehouse, Inc. At that time the stock was owned as follows:

| | |
|---|---|
| The Trust | 1,000 shares |
| Dorothy | 1,000 shares |
| Steven | 1,000 shares |
| Dorothy as custodian for Kathleen Dreiling ("Kathy") (Debtor's daughter) | 1,000 shares |
| Dorothy as custodian for Michelle M. Dreiling ("Michelle") (Debtor's daughter) | 1,000 shares. |

---

**3.** There are other bankruptcy cases with other debtors discussed herein. However, the term "Debtor" as used in this opinion refers to Lloyd J. Dreiling.

(Debtor's Direct Testimony in adversary No. 92–2174 PAC, 4/1/94.)

On November 1, 1973, Kearns changed its name to Kearns Motor Company.

In June 1977, the name of Import Jobbers Warehouse, Inc., was changed back to Dekmas Leasing Company, an additional 5,001 new shares were issued to the Trust, and new certificates were issued to all of the above named individuals. At that same time an additional 10,000 new shares were issued to F. Craig Iverson who was to run a wholesale parts operation. In February 1979, Iverson surrendered his stock, and a new certificate for those 10,-000 shares was issued to the Trust. (Direct Testimony of Debtor in Adversary No. 92–2174 PAC, 4/1/94.)

On August 25, 1978, Kearns issued an additional 8,399 new shares (Certificate No. 9) to Rob and Michelle, as joint tenants with right of survivorship, pursuant to a Stock Purchase Agreement dated August 25, 1978, (Plaintiff's Ex. D & K; Defendant's Ex. 100) in exchange for $35,000. That Stock Purchase Agreement contained a requirement that all certificates of the stock issued to the Lileys would have the following endorsement:

> The stock represented by this Certificate is subject to an Agreement dated August 25, 1978, between the Stockholders [the Lileys] and the Corporation [Kearns], and the stock is not assignable except as provided in said agreement.

This stock transfer restriction was at considerable variance from the restriction contained in the By–Laws. Certificate No. 9 does bear the restriction on its face as provided for in the Stock Purchase Agreement and has no other restrictions noted thereon. Specifically, it does not provide any rights for the other shareholders as is

specified in the By–Laws, but rather provides for the re-purchase of the stock by Kearns under certain conditions. The Stock Purchase Agreement provides in ¶ 7h that:

> The Corporation agrees and acknowledges that this Agreement takes precedence over Article IV, Section 5, of the Bylaws of the Corporation as to a transfer of the stock subject to this Agreement.

The Stock Purchase Agreement is signed by Rob & Michelle, individually, and by the Debtor as President of Kearns and Steven as Secretary of Kearns, but not by the Debtor and his wife as trustees of the Trust.

On March 1, 1986, Kearns, in exchange for the cancellation of loans in the amount of $100,000 from the Debtor to Kearns, issued an additional 21,692 new shares (Certificate No. 10) to the Debtor and his wife as trustees of the Trust. (Plaintiff's Ex. D, L.) This stock certificate did not bear any restriction on its face.[4] Thus, as of March 1, 1986, the Debtor and his wife, as trustees of the Trust, owned 61,690 shares and the Lileys owned 8,399 shares, for a total number of shares issued of 70,089. That same date Kearns increased its authorized shares to 100,000. (Plaintiff's Ex. L.)

In 1986 LJDM was not doing well and on December 12, 1986, it filed a Chapter 11 bankruptcy, Case No. 86 B 12075 J. (Direct Testimony of Debtor in Adversary No. 92–2174 PAC, 4/1/94.)

On June 1, 1987, the Debtor and his wife as trustees of the Trust transferred 9,124 shares of Kearns to the Lileys (Certificate No. 11). No restriction appears on the face of this certificate. The stock transfer book shows that these shares were from

---

4. The Minutes of Action of Directors of Kearns dated March 1, 1986, which authorized this issuance was signed by Kathleen E. Wismann [nee Dreiling] who was not eligible to be a Director because she was not a stockholder at that time. By–Laws, Art. II, § 4. (Plaintiff's Exs. C, L.)

Certificate No. 7 which was for 29,998 shares. No consideration is recited. On that same date a new Certificate No. 12 for the balance of 20,874 shares was issued to the Debtor and his wife as trustees for the Trust. No restrictions appear on this Certificate. So as of June 1, 1987, the Trust owned 52,566 shares, or 75% of the outstanding shares, which bore no indication of any stock transfer restrictions. On that same date the Lileys owned 17,523 shares, or 25% of the outstanding shares— of which 9,124 bore no indication of any stock transfer restrictions and 8,399 bore a note only of the stock transfer restrictions contained in the Stock Purchase Agreement. (Plaintiff's Ex. D.)

In 1987 LJDM filed an antitrust suit against Navistar. (Direct Testimony of Debtor in Adversary No. 92–2174 PAC, 4/1/94.)

During the pendency of the LJDM bankruptcy and the lawsuit with Navistar, the Debtor discussed a contingency plan with his attorneys and the Colorado National Bank whereby the Bank would "move its loan and collateral to a 'new' company (Denver Truck Center, Inc.) in the event Navistar prevailed in the antitrust case and the bankruptcy reorganization could not be accomplished ... so as to continue operations in an effort to pay off Colorado National Bank's loans." (Direct Testimony of Debtor in Adversary No. 92–2174 PAC, 4/1/94.)

In furtherance of this plan, "... so that the business could not be interfered with by Navistar's [sic] or other creditors of ..." LJDM (Direct Testimony of Debtor in Adversary No. 92–2174 PAC, 4/1/94), on or about October 20, 1988, all of the outstanding stock certificates (20,001 shares) for Dekmas were re-issued to the Debtor's grandchildren for no consideration to hinder, delay and defraud creditors, and the name was changed to Denver Truck Center, Inc., d/b/a Dekmas Leasing ("DTC"), but everything was backdated by the Debtor and attorney John Kearns to April 8, 1987, as follows (Order in Adversary No. 92–2174 PAC, 5/25/95):

| | |
|---|---|
| Andrea Wismann | 6,667 shares |
| Elizabeth M. Liley | 2,222 ⅓ shares |
| Theresa M. Liley | 2,222 ⅓ shares |
| Christopher R. Liley | 2,222 ⅓ shares |
| Stephanie A. Dreiling | 1,666 ¾ shares |
| Aubrey J. Dreiling | 1,666 ¾ shares |
| Kristen C. Dreiling | 1,666 ¾ shares |
| Patrick J. Dreiling | 1,666 ¾ shares |

On August 29, 1987, Patricia Dreiling ("Patricia") purportedly received a $50,000 promissory note from Kearns. (Plaintiff's Ex. UU.)

On December 23, 1987, Bill Dreiling's family (E. Dreiling Investments Company) was awarded a $400,000 judgment in state court against the Debtor on a promissory note. The Debtor claimed offsets because of investments in, and management provided to, Bill Dreiling Motor Company. However, these claimed offsets were not allowed. (Proofs of Claims No. 8 & 9 filed in Case No. 89 B 14175 A.)

Sometime in 1988 the Debtor delivered two promissory notes, wherein he was the Payee, totaling $250,000 to banks as "additional collateral" but testified in Adversary No. 90 A. 0033 that the notes were delivered in 1986. In addition, the Debtor and his wife closed five bank accounts they had, and opened up one new account in the name of the Debtor's wife only. However, the Debtor took an active role in transactions in the new account and his wife was at times a mere instrumentality of the Debtor. The Debtor and his wife gave $23,200 to their son Steven, who then paid certain of their bills. Mrs. Dreiling then asked Steven to return the balance of approximately $11,000, which he did. The Debtor's income was reduced substantially without explanation from $32,000 in 1987 to approximately $3,600 in 1988. But just the opposite occurred with Mrs. Dreiling. Her income was $5,000 in 1987 and $28,000 in 1988. The description of her employment and the number of hours she worked did not justify the increased salary, and the Debtor worked substantially longer with much more responsibility.

These actions were prompted by the judgment obtained by E. Dreiling Investments Company in December 1987. (Findings and conclusions on the record in Adversary No. 90 A. 0033, 8/3/90.)

In January 1988, LJDM settled the antitrust suit with Navistar for $2,250,000. That settlement was paid to LJDM in March 1988. The money was used to pay the secured creditors of LJDM and the attorney who tried the antitrust suit. (Order in Adversary No. 92–2174 PAC, 5/25/95.) LJDM then voluntarily dismissed its Chapter 11 bankruptcy, Case No. 86 B 12075 J, on August 2, 1988. At that time it had less than $200,000 to use as operating capital. (Direct Testimony of Debtor in Adversary No. 92–2174 PAC, 4/1/94.)

DTC started to conduct business in 1989 at 1394 W. Alameda which had been the location of LJDM before its assets were repossessed and its business closed. DTC's business consisted of selling a few used cars, but primarily it rented automobiles for use in the Denver metro area. This real property was owned by the Debtor and his wife. In 1991 that property was foreclosed upon, but the bank allowed DTC to use the property pending a decision as to what the bank wanted to do with it. (Direct Testimony of Debtor in Adversary No. 92–2174 PAC, 4/1/94.)

In the late 1980s, Kearns was operating at its location on South Broadway in Denver. The dealership, although profitable, was not living up to the expectations of Chrysler, who had purchased American Motors (Jeep/Eagle). The building and lot were too small and the building was run-down. Chrysler wanted to open a new store on South Wadsworth and had worked for several years with a developer in obtaining that location.

Around 1987, Michael Absher ("Mike"), a former American Motors employee, came to Denver to work for Chrysler. This was at the same time that Chrysler was pushing Kearns to expand and relocate to the South Wadsworth location. However, Chrysler was not pleased with the management at Kearns, and as part of its push for relocation, wanted Kearns to upgrade that management. Mike knew about Kearns and wanted to get involved in the retail side of the car business. He had looked at some other dealers. However, he decided to go with Kearns in August or September 1988.

According to Elliott Stitt (who was Chrysler's zone manager for Denver at the time and Mike's boss), Rob also wanted Mike to come with Kearns. Stitt thought a lot of Mike's abilities and felt that he and Liley (who had been operating Kearns for the most part) would "round out the management end of this whole scenario." In fact, Mike and Rob "were certainly very excited ... with the opportunity to relocate and have a properly sized facility."

This testimony of Stitt, a disinterested witness, is interesting because according to Liley, Liley had never heard of Mike until the Debtor brought him in and announced that he was going to work at Kearns. Mike testified that he dealt with the Debtor and made a deal whereby he would loan $25,000 to Kearns and would get back a $50,000 promissory note—the other $25,000 being a "signing bonus." Mike had no document evidencing this deal with the Debtor. According to Mike it was just a verbal agreement between him and the Debtor.

In any event, Mike only worked for Chrysler in Denver 6 months to a year before he went with Kearns.

The bank that foreclosed on the West Alameda property later leased 1330 W. Alameda[5] (which is where LJDM had op-

---

**5.** At various places in his April 1, 1994, Direct Testimony the Debtor talks of 1330 W. Alameda and 1394 W. Alameda. The Court cannot determine if this is deliberate or whether there were two separate and distinct locations. When he says that he and his wife owned the property and that the bank foreclosed upon the property he simply refers to it

erated) to Kearns which it used as a new car preparation staging area, detail shop and used car lot. According to Kathy, Kearns allowed DTC to use a portion of the W. Alameda property for its operations. (Direct Testimony of Kathy in Adversary No. 92–2174 PAC, 4/1/94.)

On May 12, 1989, the Debtor transferred title to a Colorado mountain cabin and an 80–acre Kansas farm to his children, within one year prior to filing his Chapter 7 bankruptcy, with the intent to hinder, delay or defraud his creditors. (Order in Adversary No. 92–2174 PAC, 5/25/95, and findings and conclusions on the record in Adversary No. 90 A. 0033, 8/3/90.)

On August 11, 1989, Kearns received a $350,000 working capital loan from Chrysler Corporation. The Debtor and his wife (individually, and not as trustees of the Trust) "sells, assigns and transfers unto Chrysler Credit Corporation" as collateral for the loan all 52,566 shares of Kearns stock held by the Trust. Rob and Michelle did likewise with their 17,523 shares of Kearns. This loan was paid down according to its terms and in 1991, prior to the initial term which ended September, 1994, the loan was re-written and an additional $150,000 was borrowed. That brought the total to $400,000. This capital loan was paid in full in 1995 or 1996. Because this capital loan was paid the stock was no longer pledged. (Plaintiff's Ex. Q & R.)

Three unusual things happened with regard to this capital loan. First, no one can find the original stock certificates that were pledged. The Chapter 7 Trustee attempted to get them from Chrysler, but Mr. Craig Osmond testified that Chrysler lost them. According to Mr. Osmond this has only happened twice during his 19 year association with Chrysler. Second, when the additional $150,000 was loaned in 1991, "Some clerk in Michigan didn't include those documents, so inadvertently those stocks [Mike and Judy Absher's stocks discussed, *infra*] were not pledged." Third, Chrysler Credit was told

as "the W. Alameda" property as though it

by Kathy that Kearns owed the Debtor $50,000 which he would subordinate to this loan. (Defendant's Ex. 21.) However, when it came time to close on the Loan on August 11, 1989, the information was changed and all of a sudden it was Patricia who was owed the $50,000, and Kathy typed over the Debtor's name and inserted Patricia's name on the Subordination Agreement. (Defendant's Ex. 25.)

As of August 23, 1989, Chrysler knew that the Debtor and Mike were negotiating for Mike's purchase of stock in Kearns. (Plaintiff's Ex. JJ.) But more than a year later, such purchase had yet to be accomplished. (Plaintiff's Ex. OO.)

On October 18, 1989, the Debtor filed his Chapter 7 bankruptcy, Case No. 89 B 14175 A, and on November 11, 1989, he filed his Statements and Schedules. In those Statements and Schedules he showed the following:

1. He was employed at 1330 W. Alameda and 3247 S. Broadway and his occupation was "Auto, Truck Sales Service Parts Management." He stated that he was a 75% shareholder and President of Kearns Motor Co. [Kearns] since 1969, but that he had "No written employment agreement and not presently on payroll."

2. In answer to the question "Have you made any other transfer, absolute or for the purpose of security, or any other disposition, of real or personal property during the year immediately preceding the filing of the original petition herein?" he answered "Pledged stock in Kearns Motor Company (75% of all outstanding shares) to Chrysler Credit for loan made contemporaneously."

3. He made no mention of the Trust or of his stock in DTC or of certain life insurance policies that had also been placed in the Trust.

4. In answer to the question concerning the value of inventory he attached

was only one piece of property.

financial reporting forms for Kearns and for LJDM.

5. In Schedule A–2 he stated that Chrysler Credit was owed $344,166 for a working capital loan "secured by Debtor's stock in Kearns Motor Company."

6. He stated the value of the 75% of Kearns stock he owned as "value unknown" in Schedule B–2.

On January 16, 1990, Bill Dreiling's family (E. Dreiling Investments Company) filed an adversary against the Debtor pursuant to 11 U.S.C. § 727 (Adversary No. 90 A. 0033).

On January 29, 1990, the Debtor filed amendments to his Schedule A–2 in his Chapter 7 case. In those amendments he stated that William Liley was secured in the sum of $200,000 from 1986–87 by a "1st D.O.T. on residence; 2nd D.O.T. on Kansas farm and on mountain cabin." The Kansas farm and mountain cabin are the same pieces of property he had fraudulently transferred to his children on May 12, 1989. At trial herein it was learned that William Liley is Rob's father. William Liley testified on August 2, 1992, in the trial in Adversary No. 90 A. 0033, that he received deeds of trust on the Kansas property and the cabin in January 1987 to secure loans to Kearns. He further testified at that trial that these deeds of trust were not demanded by him, "but he [Debtor] said that he would give it to us when we wanted it, so he [Debtor] said he would make them out for us." However, his testimony on August 2, 1992, in Adversary No. 92 A 0033; his testimony herein in Adversary No. 97–1357 RJB; and the Plaintiff's exhibits herein concerning the amounts of the loans and the dates of the loans to Kearns simply do not add up. Following is a chart showing the various testimony and exhibits concerning these loans:

| 97–1357 RJB | Plaintiff's Ex. 1,2,3,4,5,6 | 90 A 0033 |
|---|---|---|
| 4/84—$100,000 | 4/2/84—$100,000 | 10/2/84—$100,000 |
| 5/86—$ 50,000 | 5/25/84—$ 40,000 | 5/1/86—$50,000 |
| 4/89—$ 50,000 | 10/2/84—$100,000 | Sometime between |
| | 4/29/86—$10,000 | 1986 and 8/2/90– |
| | 5/1/86—$50,000 | $50,000 |

Curiously, Mr. John Baldwin, the public accountant who performed accounting services for Kearns beginning in 1984 or 1985, testified that at least from January 31, 1989, Kearns had reported to him that there was a debt owing from Kearns to the Debtor of $150,000 and that this debt was reflected on the monthly Detail Trial Balance sheets he prepared for Kearns from at least January 31, 1989, through September 30, 1989. There was no loan from William Liley shown. But the very month that the Debtor filed for bankruptcy the records of Kearns changed to reflect that this $150,000 debt was owed to William Liley. (Defendant's Exs. 137 through 141, 144, 145.) Baldwin also prepared the income tax returns for Kearns and the returns for years ended November 30, 1986, 1987, and 1988, also show that the $150,000 loan is owed to the Debtor. (Plaintiff's Ex. PPPPP and Defendant's Exs. 149, 151, 153.) However, for the year ended November 30, 1989, there is no loan shown as owing to any shareholder. (Defendant's Ex. 155.)

Mr. Baldwin testified that all the information in these documents came from people at Kearns. He also testified that he no longer has all of his records for the Kearns work because the Debtor "came and got [them] when he was having the bankruptcy hearings before. And they went into—I was told they went into a building back behind what used to be LJ Dreiling Motor

that then was flooded. And I've never gotten them back."

Thus, there is grave doubt that any money was ever loaned from William Liley to Kearns. In fact it appears that this entire "loan" from William Liley was nothing but an elaborate fraudulent scheme to accomplish two things: (1) to show that the Debtor's properties (his residence, the Kansas farm and the mountain cabin) were so heavily encumbered that there was no equity for the Chapter 7 Trustee to liquidate for creditors; and (2) to hide the fact that Kearns owed the $150,000 to the Debtor which debt was an asset of the Debtor's bankruptcy estate. Such a scheme would not be unusual for this Debtor and his family. One only has to look at the findings already made by other judges in Adversary No. 90 A. 0033 and Adversary 92–2174 PAC discussed, *supra*, to come to this conclusion.

In late January 1990, even though additional funds were borrowed for new "floorplan" financing and operating capital by LJDM, it nevertheless failed and was closed. (Testimony of Steven in Case No. 91–19282 DEC at § 341 meeting, 8/22/91, was that the date was January 31, 1990. Testimony of the Debtor in Adversary No. 92–2174 PAC, 4/22/94, was that the date was January 26, 1990.)

As early as February 20, 1990, John Kearns, who was acting as the attorney for Kearns, knew from Chrysler Credit's counsel, Mr. Donald Gentry, that there were concerns over the rights of the Chapter 7 Trustee in any contemplated restructuring of the stock ownership in Kearns. As stated by Mr. Gentry: "I am somewhat concerned that Dreiling's bankruptcy trustee may have to consent because Dreiling's 75% listed ownership in his schedules will be reduced." (Plaintiff's Ex. 31.) In late October 1990, shortly before the restructuring which took place in November 1990, which is discussed, *infra*, John Kearns was again reminded by Mr. Gentry of possible problems with the preemptive rights attached to the shares "owned" by the Trust. In a letter dated October 30, 1990, to his client Mr. Gentry stated:

> Mr. [John] Kearns was not aware of any prohibitions in the Articles of Incorporation or Bylaws which could prevent this restructuring although he is, at my suggestion, looking into preemptive rights which may be attached to the shares which would require waivers by Rob [Liley] and the Dreiling Trust. (Plaintiff's Ex. RR and WWW.)

On March 14, 1990, a Stipulation for Continued Extension of Credit and Reaffirmation of Guarantees signed by attorneys for Chrysler Credit Corporation, the Chapter 7 Trustee, and Debtor's attorney was filed in Debtor's Chapter 7 bankruptcy. Attached thereto was a Reaffirmation Agreement signed by Attorneys for Chrysler Credit Corporation and the Debtor, an Affidavit by Debtor's Attorney, and copies of Continuing Guarantees dated April 8, 1988, and August 11, 1989, signed by the Debtor and his wife. Neither the Stipulation nor the Reaffirmation Agreement was ever approved by the Court because the Debtor failed to appear. Indeed, in a colloquy between the Court and counsel for Chrysler Credit Corporation the Court stated that "His [Debtor's] not being here today creates a problem for him. It may create a problem for you as well." The Court further stated, "It may be an improper exercise [approval of the Stipulation and Reaffirmation Agreement], and Mr. Dreiling is either going to have to deal with it, or he'll have to take a walk, but Chrysler will have to do with its money what it sees fit." (Transcript of hearing Case No. 89 B 14175 A, 5/17/90.)

The Stipulation recites that the "Debtor hereby confirms the pledge of the common stock [of Kearns] as security of the existing and any future indebtedness incurred by Kearns Motor Company." The Reaffirmation Agreement attached to the Stipulation specifically only reaffirmed the Guarantees.

On April 18, 1990, the Chapter 7 Trustee filed a "No Asset" report. (Case No. 89 B 14175 A.)

On August 2 and 3, 1990, trial was held Before the Honorable Barry S. Schermer (a visiting judge from St. Louis, Missouri) in Adversary No. 90 A. 0033. The court issued findings and conclusions on the record at the conclusion of the trial. The court found that the Debtor had transferred property to his children (the Colorado mountain cabin and the 80 acre Kansas farm) within one year of filing bankruptcy with the intent to hinder, delay or defraud his creditors and that he had failed to maintain and preserve, and in fact destroyed, the financial records of LJDM in connection with LJDM's Chapter 11 bankruptcy.

This Court notes with particular interest the Debtor's testimony at trial on the issue of LJDM's records. He admitted that in his deposition taken May 1988, before trial, the following questions were asked of him, and he gave the following answers:

Q. Would the daily worksheets indicating management fees owed to you be located anyplace else beside the conference room, the old house and the old filling station?

A. There may be some.

Q. Where?

A. I don't know. I'd have to look for them. When we were in 11 and everyone threatened to have a trustee appointed—documents scatter. They go all over the place.

Q. How do you mean?

A. You just haul them off.

Q. Who does?

A. I do; me.

Q. For what purpose?

A. To hide them; to hide them.

Q. Did you do that?

A. You bet. You betcha. You bet.

Q. In case a trustee was appointed?

A. Right. What was—.

Q. Now—.

A. A trustee had no business involved in any of the other stuff.

On August 23, 1990, an Order was entered in that adversary denying the Debtor's discharge pursuant to 11 U.S.C. § 727(a)(2) and (a)(7).

On November 21, 1990, Kearns issued an additional 19,048 new shares (Certificate No. 13) to Kathy. That same date Kearns issued an additional 19,048 new shares to Mike and Judy Absher ("Judy") as joint tenants with right of survivorship (Certificate No. 14). That same date Kearns issued an additional 12,698 new shares to Rob and Michelle (Certificate No. 15). Certificates Nos. 13 and 14 do not have any stock transfer restriction noted thereon. Certificate No. 15 is not available to see if the stock transfer restriction was noted thereon or not. After these certificates were issued the stock ownership was held as follows:

| | |
|---|---|
| The Trust | 52,566 shares |
| Kathy | 19,048 shares |
| Mike & Judy | 19,048 shares |
| Rob & Michelle | 30,221 shares |
| Total outstanding shares | 120,883 shares |

The Minutes of Action of Shareholders and Directors of Kearns increasing the authorized shares from 100,000 to 200,000 dated November 16, 1990 (Plaintiff's Ex. NNNNN; Defendant's Ex. 105), was signed by the "Directors" of Kearns as follows: the Debtor, individually, Steven, and Rob, and by "Shareholders" of Kearns as follows: the Debtor as Trustee for the Trust, Rob, and Michelle. Steven was not eligible to be a Director because he owned no stock.[6]

---

**6.** That same date Steven was elected as a Director, although he was not eligible for that position. But another anomaly appears in Kearns' corporate minute book (Plaintiff's Ex. NNNNN.) After November 21, 1990, there are no entries for any meetings of shareholders until November 19, 1991. Yet, between those two dates there are several minutes of special meetings of the Board of Directors wherein it is stated that the "undersigned being all the directors of the corporation" certain action is taken. These minutes are

All of these actions were taken without notice to the Chapter 7 Trustee while the Debtor's Chapter 7 case was open and active and at a time when John Kearns, who performed legal work for the Debtor, for Kathy, for Rob and Michelle, and for Kearns, knew from Mr. Gentry that the Debtor was in bankruptcy and that the Chapter 7 Trustee might have rights that were being adversely affected by this restructuring. Rob's response was that because Kathy was there and because she was the Trustee of the Trust, there was no need to notify the Chapter 7 Trustee.

However, there is no dispute that at this time the Chapter 7 Trustee was the legal owner of 75% of the stock of Kearns by reason of 11 U.S.C. § 541. The effect of these new issues of stock was to dilute the Debtor's interest (and hence the Chapter 7 Trustee's interest) in Kearns from 75% to 43.5%.

The Abshers and Kathy supposedly paid $50,000 each for their stock. Rob said he loaned $50,000 (without even getting a promissory note) to Kathy so she could buy her stock and identified a $50,000 check dated October 12, 1990, as evidence of that loan. (Plaintiff's Ex. XX.) He in turn said that he got the $50,000 from a $32,000 loan and 2nd mortgage on his house and $18,000 from his father, William Liley, and identified a promissory note for $28,000 dated June 28, 1990, payable to the North Valley Bank and a promissory note for $18,000 dated October 11, 1990, payable to William and Yolanda Liley as evidence of these loans to him. Then Kathy said she paid that $50,000 by her check dated October 12, 1990 (Plaintiff's Ex. WW), to Patricia to purchase the $50,000 promissory note payable from Kearns to Patricia. However, there are two unexplained cashier's checks for $25,000, each dated October 17, 1990, drawn to Patricia which show Kathy as Remitter. (Defendant's Ex. 81.) Which, if any, of these checks actually were in payment for the

$50,000 promissory note cannot be determined. Then Kathy surrendered that promissory note to Kearns in payment for her stock.

But just as Patricia had great difficulty in keeping her testimony consistent on this $50,000 promissory note in other cases, Kathy had difficulty explaining it also. Kathy testified (and she professed to know these facts because she handled the accounts, etc. for Kearns from March 1986) as follows. On March 11, 1987, a check was drawn on Steven and Patricia's account for $25,000 and signed by Steven. This check was then deposited that same date into a Kearns account. (Plaintiff's Ex. AAA.) In addition, there was a promissory note payable from Kearns to Patricia for $25,000 issued and dated March 1, 1987. (Plaintiff's Ex. ZZ.) Later Kearns needed more funds so the Debtor got $40,-000 from a credit line he had with Central Bank. The Debtor then put that $40,000 into Kearns as a loan. (Plaintiff's Ex. BBB.) But he had to pay back at least $25,000 of that credit by the end of the month, so Steven, as Remitter, got one cashier's check from 1st Bank dated August 29, 1987, for $15,000 and one cashier's check from First Interstate dated August 31, 1987, for $10,000. Both of these cashier's checks were payable to the Debtor personally, not to Kearns, and the Debtor then used them to pay back the $25,000 due on his credit line. (Plaintiff's Ex. DDD.) Then it was decided that instead of Kearns owing this $25,000 to the Debtor who would in turn owe it to Steven, that they would give Patricia a new promissory note from Kearns for a total of $50,000. But if one were to go from the checks only, Kearns owed Steven $25,000 and the Debtor $40,000, and the Debtor would owe Steven $25,000. It should be pointed out that all along in other proceedings discussed, *infra*, involving Steven, both Steven and Patricia were adamant that it was she that loaned this $50,000 to Kearns, and not

---

signed only by Rob, Mike and Kathy. There is no explanation as to why the other directors, i.e., Steven and Michelle, elected on November 21, 1990, are no longer directors.

Steven. But as we can see, at least in this version of the story, Steven actually loaned all of that $50,000. By putting the promissory note in the name of Patricia it would frustrate any of Steven's creditors if they ever tried to go after his assets. He did have creditors at that time who were obtaining judgments against him. Then there is the problem of the interest paid on this note. The note called for interest at 2% over prime. But in fact, Kearns was paying to Patricia the exact amount of interest being charged to her and Steven on their 3rd mortgage. But Steven's Chapter 7 Trustee was not asleep and filed Adversary No. 92–1396 RJB which is discussed, *infra*.

Mike also supposedly paid $50,000 for his stock. On September 26, 1988, he paid Kearns $25,000 (Plaintiffs' Ex. EEE). In return he was given a promissory note from Kearns in the amount of $50,000 (Plaintiff's Ex. Q, p. 27). The extra $25,000 was for what Mike called a "signing bonus," i.e., Mike testified that he and the Debtor agreed that if he put in $25,000 it would be matched by Kearns. Mike admitted, however, that he did not report this $25,000 signing bonus as income on his tax returns for the year he received it, and only after being advised by an expert involved in this litigation did he amend his tax returns. He also admitted that until he surrendered his $50,000 promissory note, he only received monthly interest from Kearns based on $25,000. The deal was that each party (Mike and the Debtor) would take about a year to look each other over, and then if things went well, Mike would be able to buy into the corporation. Mike also testified that he and the Debtor had an understanding that (1) the Debtor would have minimal involvement in the operation of Kearns; and (2) Steven would have no involvement. However, if one looks at the documents involved in the restructure it is obvious that Steven is quite involved as a purported director. Mike also testified that he paid for his stock by surrendering his $50,000 promissory note.

Mike also testified that at no time was there any discussion about an outright cancellation of the Debtor's stock in Kearns. John Kearns, the attorney, also said there were no such discussions until he was confronted with a memo in his own writing.[7] That memo, dated March 23, 1990, reflected a meeting of that date with him, Mike, Rob, and the Debtor whereat there was a discussion about Kearns redeeming all of the Debtor's stock in exchange for cancellation of $52,566 of his indebtedness to Kearns. Kathy testified that the Debtor has owed Kearns on a promissory note for $62,521.60 since May 2, 1988 (Defendant's Ex. 18), and that Kearns still carries that debt as a "customer note." And, this meeting was only one month after Chrysler's attorney had sent John Kearns the letter (Defendant's Ex. 31) on February 20, 1990, expressing concern about getting the Debtor's Chapter 7 Trustee's consent discussed, *supra*.

Rob testified that he and Michelle paid $33,332 for their new shares from savings accounts. Rob testified that he borrowed money from his father and took out a 2nd mortgage on their house to loan $50,000 to Kathy so she could buy the promissory note from Patricia, but that the money for his new shares came from savings. However, in a letter to Mr. Saltzman, an accountant retained by the Chapter 7 Trustee, Mr. DePetro, the Attorney for the Plaintiffs herein, stated that Rob and Michelle borrowed the money for their new shares. (Defendant's Ex. 68.) At trial Rob admitted that this statement by Mr. DePetro was misleading. These transactions raise more questions. Rob wrote the check to Kearns out of a dormant account at North Valley Bank for his new shares

---

7. John Kearns, and later Patricia Dreiling, were suffering from a disease many witnesses contract—what this Court calls the "IDK-IDR"—the "I don't know—I don't remember"—syndrome, until their own attorneys asked questions. Then they seemed to have perfect recall.

on December 21, 1990, which is a month after the new shares were issued. He claimed that he gathered the funds from other accounts and put them in this account. This is the same account that he used in his loan of $50,000 to Kathy on October 12, 1990. (Plaintiff's Ex. XX.) That $50,000 came, he said, from a 2nd mortgage on his house and an $18,000 loan from William Liley. But the $32,000 2nd mortgage was obtained on June 28, 1990 (Plaintiff's Ex. YY), and yet was not deposited into the dormant North Valley account until October 11, 1998. (Defendant's Ex. 78.) The $18,000 loan from William Liley purportedly occurred October 11, 1990, and $18,000 was deposited into the North Valley account on October 12, 1990. It is curious that the amount of his 2nd mortgage is almost the same as the amount he paid Kearns for the new stock. And why did he use a dormant account through which to run all these transactions? This side of the $50,000 note payable to Patricia and purchased by Kathy raises even more questions as to the *bona fides* of that transaction. Again, the Court sees strong indications of a "shell game" being played here with phantom $50,000 checks and promissory notes. Consider the sequence of events: (1) Rob borrows $32,000 with a 2nd mortgage on his house on June 28, 1990, and apparently just let this check sit somewhere for four months; (2) Rob borrows $18,000 from his father on October 11, 1990, and puts $50,000 into a dormant account; (3) Rob loans this $50,000 to Kathy without a promissory note; (4) Kathy buys Patricia's $50,000 promissory note on October 12, 1990, and about one half of this money makes its way back to the Debtor (see *infra*); (5) Patricia's $50,000 promissory note is surrendered to Kearns for Kathy's stock; (6) Rob pays Kearns $33,332 for his shares on December 20, 1990, from a dormant account; (7) Rob deposits $33,332 obtained from other unknown and unidentified accounts, into the dormant account to cover his check to Kearns. It appears that this is the same money that went from Rob to Kathy to Patricia to the Debtor and then back to Rob and then to Kearns. The delays were necessary for the various checks to clear the various accounts.

Also, on November 21, 1990, the Minutes of Action of Shareholders of Kearns shows that Rob, Mike, Steven, Kathy, and Michelle were elected as Directors even though Steven was still not a shareholder. (Plaintiff's Ex. TT; Defendant's Ex. 108.) These minutes were signed by Dorothy as Trustee of the Trust, and all those elected as Directors except Steven. The new "Directors" then appointed Rob as President, Mike as Vice President, Steven as Secretary, and Kathy as Treasurer. (Plaintiff's Ex. TT; Defendant's Ex. 109.)

Supposedly the Debtor resigned as President and as a director of Kearns on November 21, 1990. (Plaintiff's Ex. 45, Debtor's unsigned resignation letter.) Kathy testified that while the Debtor does come into the dealership and perform some odd jobs, he is not employed there. According to her "He is retired. He—he helps me. He works with the computer. . . . He—he does some—some errands for me. . . . Oh, he will run to the bank. He will pickup titles. He will drop things off at your [counsel's] office. He will rent a motor vehicle." But, according to Kathy, he gets no compensation from Kearns.

Two things belie this impression that the Debtor no longer has any substantive role in the operation of Kearns and receives no compensation. First, after the stock restructuring, and when the Debtor supposedly had no further role in Kearns as an officer, director, or employee, the Debtor called the company attorney, John Kearns, on February 7, 1991, concerning a name change for Kearns/Denver Jeep Eagle. (Defendant's Ex. 278.)

Second, Kathy testified that she supports the Debtor and Dorothy, and has since 1990. In 1992, she bought the house they live in and on which she makes the mortgage payments. She pays all the telephone, water, and other utility bills on

the house. She pays the Debtor's grocery bills, his attorney's fees and his credit card bills, his membership at the Lakewood Country Club, and his vacations. The Debtor and Dorothy also drive two of the four demonstrator vehicles Kathy receives from Kearns and for which Kearns pays all the insurance and upkeep. She never writes a check to the Debtor, but writes checks directly to the water company, etc. In fact, she gives them gift certificates to the grocery store, so that no check is ever written to the Debtor or Dorothy. The Court does not doubt that all of these bills for the Debtor and Dorothy are indeed physically paid by Kathy. However, this is just a continuation of the Debtor's practice of having no assets in his name that his creditors may attach, and using a straw person to pay his bills, as was found by the Court in Adversary No. 90 A. 0033, *supra*, where the Debtor had everything put in Dorothy's name and they gave money to Steven to pay their bills. The only difference is that now he uses his daughter Kathy instead of his wife Dorothy. In addition, there was no reason given for the lack of support to the Debtor and his wife from the other two children. After all, Kathy is a single-parent raising a child all by herself. Why should she be the only child to pay ALL of the Debtor's bills? The testimony was that the Abshers, the Lileys and Kathy each are paid the same compensation by Kearns ($216,199.69 each in 1997). Yet there was no indication that Michelle Liley helped to support the Debtor and his wife. This anomaly is explained by the fact that Kathy's duties and responsibilities were not sufficient to justify an equal share of the compensation.

Mr. David Hawkins, CPA, testified, and the Court finds his testimony credible and persuasive, that for the duties Kathy was performing (as a Business Manager or Office Manager) she should have been paid between $62,225/year and $93,337/year. The average pay for such duties in the Denver region in 1997 for large volume dealers was $62,225. Kathy received over $200,000 for FY ended November 10, 1997,

as did the Lileys and the Abshers. So it is rather obvious that the excess pay for Kathy is designed so that she can also pay all of the Debtor's bills without the Debtor's creditors being able to attach these funds.

And what did Patricia do with the $50,000 she got from Kathy? She put it in accounts in her children's names until January 1992, then she purchased cashier's checks. One $9,000 check went to Kathy for the down payment on the house the Debtor and Dorothy are living in; one $9,000 check went to Kathy so she could pay taxes; three checks for $5,100, $5,000, and $4,900 went to Dorothy, who gave them to the Debtor, who turned them into cash. Thus, the Debtor ended up with benefit of at least $24,000 out of the $50,000. And again, there was no promissory note from Kathy to Patricia for the funds she received, which Kathy claimed were "loans."

That brings up another scheme these people have devised. Not all of the compensation that is allocated to Rob is paid to him. Rather, some portion of that compensation is paid to Michelle. And not all of Mike's compensation is paid to him, but a portion is paid to Judy. However, neither Michelle nor Judy are employed by Kearns. They perform no services for Kearns. They factitiously testified that they are required to attend functions for Kearns with their husbands. When questioned closely by the Court it was revealed this meant they went to new car shows and cocktail parties, but they couldn't even remember where or when the last such show was held. They also tried to justify these payments by saying that since they had to sign guarantees to Chrysler in connection with Kearns loans they were entitled to this compensation. In the final analysis, they admitted that they split this income between husbands and wives just to build up Social Security credits for the wives. This is nothing more than a fraud against Social Security. Wouldn't a lot of hus-

bands like to have their paychecks split off to their wives so their wives could also accrue Social Security credits towards future benefits?

In 1991 DTC ceased doing business. (Plaintiff's Ex. QQQQQ, Letter from Debtor's attorney to Chapter 7 Trustee's Attorney, 1/26/96; Testimony of Kathy 11/9/98.)

On February 20, 1991, Kearns filed a Certificate of Assumed or Trade Name for Denver Jeep Eagle, Inc. (Defendant's Ex. 111.)

Kearns and Chrysler had been working toward the relocation to South Broadway since about 1988. During this interim period Kearns was still not doing well because it was undercapitalized and in a poor location with sub-standard facilities. In May 1991, Kearns moved from South Broadway to South Wadsworth. However, it was still undercapitalized even after Mike, Rob, and Kathy "bought" the new issue of shares in November 1990. Therefore, they sought a $400,000 capital loan from Chrysler Manufacturing as opposed to Chrysler Credit. Chrysler Credit had already turned them down for such a loan. (Plaintiff's Ex. PP.) Chrysler Credit already had loaned Kearns $225,000 and had a lien on all the assets of Kearns. So Chrysler Manufacturing agreed to loan the $400,000 on an unsecured basis with guarantees from all the shareholders. However, the Chapter 7 Trustee never executed such a guaranty.

On July 10, 1991, Steven filed his Chapter 7 bankruptcy. (Case No. 91–19282 DEC.)

On August 22, 1991, Steven testified at his first meeting of creditors pursuant to 11 U.S.C. § 341 that the money from a $130,000 loan and 2nd Deed of Trust on his and Patricia's home and a $50,000 loan and 3rd Deed of Trust on that home was used for "living expenses, mainly." (Transcript, § 341 meeting, Case No. 91–19282 DEC, 8/22/91.) However, Patricia would later contradict that testimony, *infra*.

On September 16, 1991, the Debtor's Chapter 7 case was closed.

On October 1, 1991, Associates Commercial Corporation filed Adversary No. 91–1816 CEM against Steven seeking to deny his discharge pursuant to 11 U.S.C. §§ 523(a)(4) and 727(a)(7). The complaint was later amended on January 21, 1992, to add claims pursuant to 11 U.S.C. §§ 727(a)(2), (3), (4), and (5).

On October 22, 1991, Dorothy filed her Chapter 7 bankruptcy petition. (Case No. 91–24052 SBB.) She did not reveal her contingent beneficial interests in the Trust.

On November 19, 1991, again with no notice to the Chapter 7 Trustee, Kearns held an Annual Meeting of the shareholders where Kathy acted as Trustee of the Trust. At this time Rob, Mike, and Kathy were elected as Directors. (Defendant's Ex. 115.) Thereafter, Rob was appointed as President, Mike as Vice President, and Kathy as Secretary/Treasurer.

On December 13, 1991, Patricia was deposed in Adversary No. 91–1816 CEM. She stated that her 1987 loan of $50,000 to Kearns (Plaintiff's Ex. UU) was repaid by Kearns in 1991. Then she later said she was bought out by Rob with his personal check. She also stated that the $130,000 loan and 2nd Deed of Trust on her and Steven's home was used as follows: $80,000 for home improvements and $50,000 for the loan to Kearns. Finally, she stated that a $50,000 loan and 3rd Deed of Trust on their home was never used for household purposes, but for "estate planning," i.e., she put it in her children's names. (Deposition in Adversary No. 91–1816 CEM found in Adversary No. 92–1396 RJB.) One must remember that at this time Steven was in Chapter 7 and had been asked to explain where the funds received for these two loans ($130,000 and $50,000) had gone. Obviously, Patricia and Steven did not want Steven's creditors to have any claims on those funds.

On January 1, 1992, CFD IV, Inc., filed Adversary No. 92–1036 CEM seeking to

deny Steven's Chapter 7 discharge pursuant to 11 U.S.C. § 727.

Dorothy received a Chapter 7 discharge on February 25, 1992. (Case No. 91–24052 SBB.)

On March 13, 1992, the Chapter 7 Trustee in Steven's case filed Adversary No. 92–1396 RJB against Patricia, individually and as custodian of her children, and against Steven as custodian of his children pursuant to 11 U.S.C. § 542,544, 548, 549, and 550 and C.R.S. § 38–10–117 to recover certain moneys and the DTC stock which the Debtor transferred to their children. Later Dorothy and Kathy were added as defendants.

In Steven's Answer to the Complaint in Adversary No. 92–1396 RJB filed April 30, 1992, he stated that Kathy bought the $50,000 promissory note (Plaintiff's Ex. UU) from Patricia. Patricia in her Answer filed the same date stated that the $130,000 2nd mortgage money was used as follows: $30,000 for home improvements; $50,000 to Steven for his sole use; and $50,000 for the loan to Kearns. These statement should be compared with their earlier testimony, *supra.*

On May 14, 1992, Dorothy resisted revealing her residence address to Steven's Chapter 7 Trustee so that she could be served with a temporary restraining order entered in Adversary No. 92–1396 RJB. However, on May 16, 1992, the Court ordered her to reveal her residence address to the Chapter 7 Trustee and the Court. (Case No. 91–24052 SBB.)

On June 25, 1992, the Chapter 7 Trustee filed a Motion to Reopen the Debtor's Chapter 7 case which was granted on July 2, 1992.

A review of the docket for Case No. 86 B 12075 J shows that LJDM filed a motion to re-open its Chapter 11 case on July 10, 1992, which was denied on July 28, 1992. If LJDM failed in 1990, the Court cannot fathom why a motion to re-open the old Chapter 11 case was filed two years later.

On September 14, 1992, trial was held before the Honorable Charles E. Matheson in Adversary No. 91–1816 CEM on only one claim against Steven pursuant to 11 U.S.C. § 717(a)(7). The Court denied his discharge for refusing to obey a lawful order of the court, i.e., not appearing to testify in accordance with a subpoena in Adversary No. 90 A. 0033 and then not paying the sanctions award ordered by the Court in connection with that failure to appear. This ruling mooted all other claims in Adversary No. 91–1816 CEM. (Transcript in Adversary No. 92–1816 CEM, 9/14/92.)

On September 16, 1992, a 2nd Amended Complaint was filed in Adversary No. 92–1396 RJB that added Kearns, the Debtor, and Auto Management, Inc., as defendants. It also added a claim asserting that all the defendants conspired to hide Steven's assets.

On September 25, 1992, the Debtor's Chapter 7 Trustee filed an Adversary Complaint (92–2174 PAC) against the Debtor individually and d/b/a DTC; Kathy as custodian of Andrea Wismann; Michelle as custodian of Elizabeth, Theresa and Christopher Liley; Patricia as custodian of Stephanie, Aubrey, Kristen and Patrick Dreiling; and the Trust. The complaint sought turnover of the 75% of DTC's stock that had been transferred to the Debtor's grandchildren pursuant to 11 U.S.C. §§ 542, 544, 548, and 550 and C.R.S. § 38–10–117.

On May 20, 1993, Patricia filed a Pre-Trial Statement in Adversary No. 92–1396 RJB wherein she stated that Rob had purchased the $50,000 Kearns promissory note from her. But then, on June 4, 1993, in an Amended Pre-Trial Statement she asserts that Kathy had purchased the note from her. Compare this to her deposition testimony, *supra,* on December 13, 1991.

On the eve of trial on June 18, 1993, in Adversary No. 92–1396 RJB, the parties filed a Stipulation for Dismissal of claims against the Debtor, Dorothy, Kathy, Kearns, DTC, and Auto Management, Inc.

The Stipulation provided Kathy would pay $10,000 and Kearns would pay $175,000 to Steven's Chapter 7 Trustee, and if not paid as agreed, a $500,000 default judgment could enter against these defendants, jointly and severally. Needless to say, the Debtor's Chapter 7 Trustee, who owned more than 52,000 shares of Kearns, was not consulted or notified of this Stipulation.

On June 21, 1993, the day set for trial in Adversary No. 92–1396 RJB, another Stipulation for Dismissal of claims against the remaining defendants, Steven and Patricia, was filed. This Stipulation provided that these defendants would pay Steven's Trustee $30,000, $15,000 of which was secured by a Deed of Trust on Kathy's home. If these payments were not made, a $500,000 default judgment could enter against these defendants, jointly and severally.

Both of these Stipulations contained a confidentiality agreement whereby if Steven's Chapter 7 Trustee or his attorney were served with documents of discovery, or if they were subpoenaed to testify, or if they were otherwise compelled by an order of court to divulge any files, documents, or work product, then notice must be given to the defendants and their attorneys in writing in order to allow them to take action to protect their respective interests.

On July 13, 1993, Debtor's Chapter 7 Trustee joined Dorothy's Chapter 7 Trustee as a co-plaintiff in Adversary No. 93–1345 RJB against Kearns Motor Company a/k/a Denver Jeep Eagle and the Debtor.

On December 1, 1993, Dorothy, the Debtor, Steven, Kathy, Michelle and Kearns agreed to pay Dorothy's Chapter 7 Trustee $4,500 to settle potential claims concerning the transfer of the mountain cabin and the Kansas farm, and her contingent beneficial interests in the Trust which she failed to reveal on her Statements and Schedules. (Case No. 91–24052 SBB.)

On April 13, 1994, the Debtor's Chapter 7 Trustee filed a Notice of Possible Dividend in the Debtor's Chapter 7 case. (Case No. 89 B 14175 A.)

After much pre-trial activity in Adversary No. 92–2174 PAC, which was filed September 25, 1992, trial commenced before the Hon. Patricia A. Clark on April 21, 1994. The trial was actually held on April 21, 22, 28, and June 3, 1994. It is important to go into some detail about the progress of this Adversary Proceeding. Remember, this was a Complaint whereby the Debtor's Chapter 7 Trustee was seeking to have the DTC stock which had been transferred to the Debtor's grandchildren, or its value, returned. The original complaint also sought an accounting and injunctive relief.

The first skirmish was in October 1992, when the Defendants filed motions to dismiss. These were set for hearing on November 12, 1992. At that hearing the parties were ordered to file a joint status report by November 18, 1992, which they did. In that Joint Status Report all agreed (including Mr. DePetro) as undisputed facts that:

1. Prior to the Debtor's Chapter 7 bankruptcy filing the assets of the Trust included stock in DTC which was not disclosed on the Debtor's schedules, whole life insurance policies and Kearns stock.

2. That the Debtor was the settlor of the Trust, the beneficiaries are the Debtor, his wife, and his grandchildren, and the Trustee for the Trust is now Kathy.

3. That the Trust was not disclosed on the Debtor's bankruptcy schedules.

4. That no one representing any of the defendants appears to know where the Debtor conducts business, although the Debtor's Chapter 7 Trustee believes that DTC and the Debtor conduct business at 1330 West Alameda Avenue, Denver, Colorado under the name of "Denver Jeep Eagle."

No one attempted to disavow Debtor's Chapter 7 Trustee of this misconception that DTC and Denver Jeep Eagle were one and the same.

On January 26, 1993, the Court determined that the issue before the Court was whether or not the Complaint was time-barred by 11 U.S.C. § 546(a) and ordered the parties to file a statement of stipulated facts by February 16, 1993, and briefs by February 18, 1993.

On February 16, 1993, the Parties filed a Joint Stipulation of Facts (signed by Mr. DePetro) which included the following:

1. The Trust was created September 9, 1969, and the Settlor was the Debtor. The Trustee is Kathy and the beneficiaries were the Debtor's wife and his children.

2. The corpus of the Trust included whole life insurance policies and stock in Kearns and LJDM. The existence of the Trust was not disclosed in the Debtor's schedules, the stock of Kearns and LJDM was disclosed with an unknown value. The Debtor did not disclose the ownership of any life insurance policies.

3. At one time, 16,001 shares of DTC were owned by the Trust but that now only the Debtor's grandchildren are shareholders.

4. *"DTC continues to operate in business as of the date of this action [September 25, 1992]."* [Emphasis added]. This was later admitted by Kathy at the trial herein to be false.

█ These two documents, the Joint Status Report and the Joint Stipulation of Facts, which were filed with the Court, were both signed by Mr. DePetro, counsel for the Plaintiffs herein. That is disturbing because the role of an ethical lawyer is "as an officer of the court and a key component of a system of justice, dedicated to a search for the truth. . . ." *Nix v. Whiteside,* 475 U.S. 157, 174, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986). A fundamental premise of our judicial system is that "[a]ttorneys are officers of the court, and when they address a judge solemnly upon a matter before the court, their declarations are virtually made under oath." *Selsor v. Kaiser,* 81 F.3d 1492, 1501 (10th Cir.1996) quoting from *Holloway v. Arkansas,* 435

U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978).

On September 1, 1993, the Court, after considering the motions to dismiss as motions for summary judgment, denied the motions, and relying on *Amazing Enterprises, et al. v. Jobin,* 153 B.R. 308 (D.Colo.1993), held that the limitations period under § 546 is not jurisdictional, that it can be waived, and that, in appropriate circumstances, the doctrine of equitable tolling can apply. Further the Court found that in this case the Debtor's Chapter 7 Trustee acted with due diligence. Finally the Court ordered the defendants to file answers by September 14, 1993. The Answers were duly filed and trial was scheduled for April 21, 1994.

When counsel for the Chapter 7 Trustee sought to subpoena records from Steven's Chapter 7 Trustee they were met with opposition from these Defendants who were alerted because of the confidentiality agreement referred to, *supra.* As a result, only a limited number of documents were obtained, i.e., documents relating to DTC. (Transcript herein 11/25/98, p. 27.)

On April 5, 1994, the Chapter 7 Trustee filed his Pre–Trial Statement. In that Statement he declared, under the caption "Disputed Issues" the following:

1. What interest the Debtor had as of the petition date in the following: "(a). The Trust ("Trust"); . . . (c). Kerns Motor Company; (d). Lloyd J. Dreiling Motor Company; (e). Denver Trust [sic] Center ("DTC"); . . . (j). Kansas Farm; and (k). Colorado Cabin." . . .

11. Whether the Trustee is entitled to avoidance of the transfers of the Debtor's interest in the above-described entities.

The Defendants almost immediately on April 5, 1994, filed a Motion to Strike asserting that the Chapter 7 Trustee was, for the first time, seeking to recover stock owned by the Trust in Kearns and the Kansas farm and Colorado cabin and

asked the Court to prohibit the Chapter 7 Trustee from pursuing this perceived action. The original Complaint and succeeding Amended Complaints never sought to recover Kearns stock. The reason was quite simple. The stock Debtor listed as his own in his schedules, i.e., 75% of Kearns stock, was in fact owned by the Trust which was a self-settled trust which the Debtor could revoke at any time, and, therefore, this stock was already part of the Debtor's bankruptcy estate. There was no need to seek to "recover" that stock under the preference or fraudulent transfer statutes. But at the close of the Chapter 7 Trustee's case in chief at trial on April 28, 1994, the Defendants again inserted this "red herring," i.e., that the Chapter 7 Trustee was seeking recovery of, or turnover of, the Kearns stock when Mr. DePetro argued for dismissal or directed verdict as follows:

> But Judge, our argument with respect to both the fraudulent conveyance, obviously if there's an alter ego and the trust is sort of disavowed, as it seems it was, at least through his [Debtor] schedules, that there was a disclosure of that [Kearns stock] and there couldn't be any transfer. And I don't think that there's any evidence, Your Honor, with respect to Kearns Motor Company that there was ever any transfer of that stock other than it being originally moved from Mr. Dreiling after he bought it from Jack Kearns—Jack Kearns' estate to it being used and funded in the trust that Mr. Kearns prepared initially.

Counsel for the Chapter 7 Trustee explained, very clearly, as follows:

> And, we're not disputing, Your Honor, that the stock was listed. What I'm saying is the complaint is seeking the avoidance of transfers of the Denver Truck Center Stock. And, we brought in evidence concerning Kearns Motor to show the debtor's propensity to ignore the trusts when it was convenient. We're not looking to avoid a transfer of Kearns stock.... Yes, just as we are

not going after the Colorado cabin and the Kansas farm. Those were other transfers that were made and they were introduced into evidence to establish his [Debtor's] propensity to transfer to keep either property in the family or to family members for no consideration when—at a time when he was having financial difficulty.

In addition, during the trial of Adversary No. 92–2174 PAC, counsel for the Debtor's Chapter 7 Trustee observed that Kathy, a defendant therein, had not been present. Because it was anticipated by this counsel that counsel would need to call Kathy as a witness, counsel caused a subpoena to be issued compelling her attendance. However, there was strong evidence presented that Kathy was avoiding this service of process. (Transcript Adversary No. 92–2174 PAC.) She was never served and never testified.

At the conclusion of the evidence in that trial on June 3, 1994, the Court ordered that the Debtor furnish authorizations for the Chapter 7 Trustee to obtain information from a number of insurance companies relative to the life insurance policies the Debtor had placed in the Trust. This process and the subsequent investigation by the Chapter 7 Trustee took a considerable amount of time. On June 28, 1995, the defendants filed a pleading resisting the Chapter 7 Trustee's attempts to get the proper authorizations. On June 30, 1995, the Court ordered that the Defendants comply and provide the appropriately signed authorizations. After an intensive investigation it was discovered there was little or no value to these policies. The Court issued its Order on May 25, 1995, holding that the only issue left for determination was whether the transfer of the DTC stock to the Debtor's grandchildren was fraudulent. The Court found it was fraudulent and ordered that on or before June 13, 1995, the defendants had to surrender their stock and that new stock be issued to the Chapter 7 Trustee.

The reason for the extensive discussion, *supra,* concerning Adversary No. 92–2174 PAC is to point out that the Debtor and his family fought a vigorous battle to keep the Chapter 7 Trustee from getting the DTC stock and the life insurance policies. This is particularly troubling when it is learned later that (1) DTC had ceased doing business the year before the adversary was filed, and, therefore, the DTC stock had no value, and (2) the life insurance policies had little or no value. There must have been a reason why they fought for more than two years and incurred thousands of dollars in attorney's fees to keep from turning over worthless assets to the Chapter 7 Trustee.

Throughout that adversary proceeding they knew that the Trustee was confused about the various corporate entities of the Debtor and which one was actually Denver Jeep Eagle [Kearns], yet they did nothing to clarify these misunderstandings of the Chapter 7 Trustee. When they thought the Chapter 7 Trustee was getting close to information about Kearns, they tried to block his efforts, e.g., they resisted his efforts to get Kearns documents from Steven's Chapter 7 Trustee, and they were successful. The Chapter 7 Trustee wrote to all opposing counsel in Adversary No. 92–2174 PAC on December 3, 1992, and requested, *inter alia,* any and all corporate records for both Kearns and DTC and for all Kearns stock, but received nothing. (Plaintiff's Ex. LLL.) He sought such documents directly from the Debtor in written discovery (Plaintiff's Ex. PPP) and the Debtor responded that he didn't have any of those records. When they thought that maybe, just maybe, the Chapter 7 Trustee might be trying to get the Kearns stock, they tried to strike that from the Chapter 7 Trustee's Pre–Trial Statement, and went so far as to argue in closing that the complaint as to Kearns should be dismissed, even when there was no attempt by the Chapter 7 Trustee to affect the Kearns stock.

The only logical explanation for this type of behavior is that the Debtor and his family and associates were trying to set up a smoke screen to keep the Chapter 7 Trustee from discovering the fact that his interest in Kearns had been diluted from 75% to 43.5% on November 21, 1990.

On March 30, 1995, the Chapter 7 Trustee abandoned 20 life insurance policies in the Debtor's Chapter 7 case. (Case No. 89 B 14175 A.)

On March 22, 1996, Dorothy's Chapter 7 case was closed. (Case No. 91–24052 SBB.)

In November 1995, the Chapter 7 Trustee, through counsel, wrote to counsel (Mr. DePetro) who had represented most of the defendants in Adversary No. 92–2174 PAC requesting corporate records. Mr. DePetro responded January 9, 1996, that all of the DTC records had been thrown away by unknown persons. Remember, Mr. Baldwin had been told the records were destroyed in a flood. On January 26, 1996, a reply letter was received from Mr. Silverman (Debtor's present counsel) along with some DTC corporate documents. (Attachments to Trustee's Response to Order to Show Cause filed 4/26/96 in Case No. 89 B 14175 A)

On April 19, 1996, the Chapter 7 Trustee filed a Motion for Turnover of Debtor's Stock in Kearns. Attached to that Motion was a copy of a letter where the Chapter 7 Trustee had made written demand on Debtor's counsel for such a turnover. (89 B 14175 A.)

On April 30, 1996, the Debtor filed a Response to this motion opposing it. Interestingly, the Debtor asserts that he is not the owner of the Kearns stock, but rather the Trust is the owner. He also asserts that "The issue of the Trustee's rights in the Kearns Motor Company stock *has already been litigated and decided by Judge Clark in an adversary proceeding known as Cimino, Trustee, v. Dreiling, Adversary No. 92–2174 PAC."* [Emphasis is the original.]

On July 10, 1996, the Court (Honorable Sidney B. Brooks) thoroughly analyzed the evidence and thoughtfully considered the arguments (including the assertion, *supra*, that the Trustee's rights in the Kearns stock had already been determined in Adversary No. 92–2174 PAC) of the Debtor that the turnover motion should be denied based on the doctrines of *res judicata*, collateral estoppel, and/or law of the case. He concluded, in a much more eloquent manner than the undersigned could have mustered, that these arguments were, in effect, specious.

Thereafter, on July 26, 1996, Judge Brooks decided that last remaining issue, i.e., whether the Chapter 7 Trustee abandoned, either directly or indirectly, his right, title or interest in the Kearns stock. He concluded that, as a matter of law, abandonment was not effected by operation of law in this case. He further noted that "... this bankruptcy case has been laced with and this bankruptcy Debtor has been implicated in, serious and substantial bankruptcy fraud, deception, and misdirection. In that context, Debtor's assertions of abandonment by this Trustee are still more tenuous." Thereafter, he ordered that the Trustee's motion for turnover was granted and that the Debtor turn over to the Chapter 7 Trustee all of his right, title and interest in Kearns stock, and all stock certificates representing or related to such rights and interests, on or before August 1, 1996. (Case No. 89 B 14175 A.) That Order was on appeal to the U.S. District Court at the time of the trial herein, but the parties herein agreed that only for purposes of the trial herein the Court may consider as fact that the Chapter 7 Trustee is indeed entitled to the Kearns stock. Subsequent to the trial herein, the U.S. District Court affirmed Judge Brooks on March 22, 1999.[8]

On July 9, 1997, one full year after Judge Brooks' order, Kearns issued 52,566 shares to the Lloyd J. Dreiling Trust (Certificate No. 16) with a note in the stock transfer book that this Certificate is a "Replacement Certificate for lost Certificates 8, 10, 12." This certificate bears no note of any stock transfer restriction.

On July 18, 1997, Kearns issued 52,566 shares (Certificate No. 17) to "John A. Cimino, Trustee—Bankruptcy Case # 89B14175A" with a reference in the stock transfer book to Certificate No. 16. This certificate bears no note of any stock transfer restriction. (Plaintiff's Ex. D.)

In July 1998, just a matter of days after this Court held a scheduling conference and set the trial date, Kathy purportedly paid William Liley $100,000 and took an assignment of a promissory note. She now claims that she is the secured party on the mountain cabin and Kansas farm and that Kearns owes her that $100,000 as is shown on the books of Kearns. (Defendant's Ex. 274.) She testified that she posted $90,000 for an appeal bond in 1997 and that she had this $90,000 in a money market account at the time. The original source of the $90,000, she claims, came from a year-end bonus of $40,000 from Kearns in November 1996—a bonus that she conveniently did not reveal in her deposition when she was asked about how she was compensated by Kearns—and a draw of $50,000 against the 1997 bonus. She also said that Rob and Mike got identical bonuses and draws. Yet there was nothing on the books of Kearns reflecting these three draws of $50,000 each. In addition, the Plaintiffs caused Kearns to pay $100,000 to William Liley for the balance of the money allegedly owed by Kearns. But the books of Kearns, at least as late as June 30, 1998, only showed a total debt owing of $150,000. (Defendant's Ex. 272.)

On September 25, 1998, Kearns issued Certificate No. 18 for 52,566 shares to Trustee Cimino with a reference in the stock transfer book to Certificate No. 17. On this same date Certificate No. 19 was issued to the Lileys for 8,399 shares with a

**8.** *Lloyd J. Dreiling v. John A. Cimino*, Civil Action Nos. 96 N 1885 and 97 N 2058.

reference in the stock transfer book that it is for Certificate No. 9. On that same date Kearns issued Certificate No. 20 to the Lileys for 9,124 shares with a reference in the stock transfer book to Certificate No. 11. On that same date Kearns issued Certificate No. 21 to the Abshers for 19,-048 shares with a reference in the stock transfer book to Certificate No. 14. All of these certificates have the stock transfer restriction called for by the By–Laws noted on their faces, with the exception of Certificate No. 19 issued to the Lileys supposedly in exchange for Certificate No. 9 which contains only the stock transfer restriction called for by the Stock Purchase Agreement. (Plaintiff's Ex. D.) However, these re-issues of stock to the Chapter 7 Trustee and the others occurred only after the Chapter 7 Trustee filed a Motion for Summary Judgment herein on September 14, 1998, asserting that he was not bound by the stock sale restriction because he had no actual notice of the same. Eleven days later these new certificates were issued.

On September 30, 1998, Kearns issued Certificate No. 22 to the Lileys for 12,698 shares with a reference in the stock transfer book to Certificate No. 15. On that same date Kearns issued Certificate No. 23 for 19,048 shares to Kathleen E. Dreiling with a reference in the stock transfer book to Certificate No. 13. Both of these certificates have the stock transfer restriction called for by the By–Laws. It must be noted that from March 6, 1986, to September 25, 1998, ALL of the outstanding certificates bore ABSOLUTELY NO NOTATION of the stock transfer restriction as required by the By–Laws. (Plaintiff's Ex. D.)

## DISCUSSION

The Plaintiffs and the Third Party Defendant (Debtor) seek a declaratory judgment that in both law and equity Kearns is owned as follows:

| | | |
|---|---|---|
| Chapter 7 Trustee | 52,566 shares | 43.48502% |
| Kathy Dreiling | 19,048 shares | 15.75738% |
| Mike & Judy Absher | 19,048 shares | 15.75738% |
| Rob & Michelle Liley | 30,221 shares | 25.00020% |
| Total | 120,883 shares | 99.99998% |

They also seek a declaratory judgment that Article IV, § 5 of the Kearns By–Laws is in full force and effect and the shares owned by the Chapter 7 Trustee are subject to the stock sale restriction set forth therein.

On the other hand, the Chapter 7 Trustee asserts that the restructure of the Kearns stock in November 1990 was improper on several grounds and, therefore, the Chapter 7 Trustee should be declared to be the owner of 75% of the stock and that he should not be bound by the provisions of Article IV, § 5 of the By–Laws.

The Chapter 7 Trustee asserts that the restructure of Kearns stock was improper because:

1. The restructure was authorized by an illegally constituted board of directors.

2. The restructure was not authorized by the stockholders entitled to approve it.

3. The Chapter 7 Trustee was denied his preemptive rights to purchase additional shares so as to maintain his 75% ownership.

4. Kathy, Rob, Michelle, Mike, and Judy did not give good consideration to Kearns for the shares they received in the restructure and the restructure constituted a fraudulent transfer and a breech of fiduciary duty.

There is no argument that as of the date the Debtor filed bankruptcy (October 18, 1989) the Kearns shares owned by the self-settled, revocable Trust, became property of the Debtor's bankruptcy estate pursuant to 11 U.S.C. § 541. Therefore, only the Chapter 7 Trustee could vote those shares. Nevertheless, on November 16, 1990, without notice to the Chapter 7 Trustee, there was a purported meeting of shareholders where Kearns increased its authorized shares from 100,000 to 200,000. The Debtor illegally signed

the minutes on behalf of the Trust because the Chapter 7 Trustee was the only person authorized to vote the shares that stood in the name of the Trust. Under the Colorado Corporation Code in effect at that time, C.R.S. § 7–2–108(a) and Article XV, § 9 of the Colorado Constitution, it was mandatory that all stockholders had to vote on such a matter after at least thirty days' notice. *Hampton v. Tri–State Fin. Corp.*, 30 Colo. App. 420, 495 P.2d 566 (1972). Therefore, this action by the shareholders was illegal.

■ On November 21, 1990, the purported directors (the Debtor, Steven, and Rob) authorized Kearns to issue the new stock to Kathy, Rob, Michelle, Mike and Judy for the restructure. There are no corporate minutes indicating that Steven was ever elected as a director. The last previous minutes showing an election of directors was March 1, 1986, when the Debtor, Robert and Kathy were elected. Kathy was not eligible for that position on that date. Then, all of a sudden, on June 1, 1988, Steven signed as a director when the Debtor, Rob and Steven were appointed as officers of Kearns. Therefore, this issue of new shares was illegal. (Plaintiff's Ex. NNNNN.)

■ Then, also on November 21, 1990, the purported shareholders, Rob, Michelle, Kathy, Mike, and Judy, along with the Trust (signed for by Dorothy as Trustee) elected Rob, Mike, Steven, Kathy, and Michelle as directors. This action was illegal because Kathy, Mike and Judy were not properly shareholders and only the Chapter 7 Trustee could vote the shares in the name of the Trust.

■ Even if the increase in authorized shares was proper, and even if the new stock was properly issued to Rob, Michelle, Kathy, Mike and Judy, by failing to notify the Chapter 7 Trustee of these actions, the parties denied the Chapter 7 Trustee his preemptive rights provided for in Article Eighth of the Articles of Incorporation. The remedies for a violation of a shareholder's preemptive right are to ei-

ther allow that shareholder to buy additional shares at the same price for the newly issued shares so that his percentage of ownership is preserved or to force the corporation to cancel the shares issued in violation of the aggrieved shareholder. *Breniman v. Agricultural Consultants, Inc.*, 648 P.2d 165 (Colo.App.1982).

■ The Chapter 7 Trustee also asserts that the restructure constituted a fraudulent transfer under the then existing Colorado statute, C.R.S. § 38–10–117, which provided that all conveyances of property, real or personal, "made with the intent to hinder, delay, or defraud creditors," are void. And if the transfer was to a family member it was deemed fraudulent, without regard to intent, if there was a lack of adequate consideration and the transferor was insolvent at the time. *Harvey v. Harvey*, 841 P.2d 375 (Colo.App. 1992). Under that statute, once a showing was made that the transfer was to a family member, the burden of proof shifted to the transferee to show that the transfer was honest, made in good faith for valuable consideration, without the intent to hinder and defraud creditors, and that the transferor was solvent at the time. *Erjavec v. Herrick*, 827 P.2d 615 (Colo.App.1992).

In this case there was a transfer to family members (Kathy and the Lileys), but there was also a transfer to non-family members, i.e., the Abshers. Thus, the Chapter 7 Trustee cannot have the benefit of the shifted burden of proof.

■ The evidence is clear that the Debtor participated substantially in the restructure and that he was insolvent at the time. He was, after all, in bankruptcy, and his schedules clearly establish that he was insolvent. The transferees (Kathy, the Lileys, and the Abshers) knew full well that the Debtor was in bankruptcy. Knowing this, they are charged with the knowledge that the shares the Debtor owned in Kearns were property of the estate and that a dilution of those shares would deprive creditors of the bankruptcy

estate of the full value of said shares. The actions of the Debtor and of the transferees herein and throughout their various and sundry sojourns through this Court make it clear that there was intent on everyone's part to hide and secrete assets from the Chapter 7 Trustee, and thus from the creditors. Thus, under the statute as it existed in 1990, the Chapter 7 Trustee has established the requirements set forth in *Yetter Well Serv., Inc. v. Cimarron Oil Co.*, 841 P.2d 1068 (Colo.App.1992).

 In addition, the denial of the Chapter 7 Trustee's preemptive rights was, in effect, a postpetition transfer of property of the estate which a trustee may avoid under 11 U.S.C. § 549(a). As this Court stated in its Order of August 26, 1997, on the Plaintiffs' and the Debtor's Motions to Dismiss:

> It is axiomatic that the value of the stock held by the Trustee before the issuance of the Treasury stock was considerably higher than the value immediately thereafter. This diminution of value was no less real than if Dreiling [Debtor] had conveyed ownership of the Trustee's stock in Kearns. Not only that, the issuance of the Treasury stock effectively transferred majority control of Kearns from the Trustee. Ownership of a majority interest in the stock of a corporation carries with it many rights and powers unavailable to minority interests. Those rights and powers are but additional sticks in the bundle of rights enjoyed by the owner of the majority interest. These ownership rights and powers were taken from the Trustee and transferred to the individual Plaintiffs.

The evidence at trial showed that the value per share of the stock in the hands of the Chapter 7 Trustee was higher if the Trustee held a majority interest. Thus, after the restructure, the value of each share held by the Chapter 7 Trustee was worth less. This constituted a transfer of property of the bankruptcy estate under 11 U.S.C. § 549. Such transfer was not authorized by the Court or by the Bankruptcy Code and it took place after the Debtor's bankruptcy petition was filed and the case was still open and pending. The intent of the parties effecting the transfer is irrelevant under § 549. *Shields v. Duggan*, 197 B.R. 860 (Bankr.D.Minn.1996). Likewise, fraud is not an element for a cause of action by the Trustee under § 549. *In re Kingsley*, 208 B.R. 921 (8th Cir.1997).

 Subsection (c) of § 549 provides that a trustee may not avoid such a postpetition transfer if the property was transferred to a good faith purchaser without knowledge of the commencement of the case and for present fair equivalent value. The individual Plaintiffs here have not established that they paid a fair equivalent value for the property transferred postpetition, i.e., there is no evidence that they paid for the Chapter 7 Trustee's loss of the rights and powers of his majority interest position. Neither have they established to this Court's satisfaction that they were unaware that the Debtor had commenced his bankruptcy case. Quite the contrary. In fact, their attorney, John Kearns, knew months before the restructure that the Debtor was in bankruptcy. They gave self-serving testimony that they did not know who Mr. Cimino (the Chapter 7 Trustee) was, but they gave no testimony that they did not know their father, or father-in-law, or business partner, had filed for bankruptcy. Finally, as shown by the discussion, *supra* and *infra*, of how and what the Lileys, the Abshers and Kathy paid for the stock they received, this Court cannot find that they have established that they paid fair equivalent value for the stock they received.

It has been difficult for this Court to decide the issue of whether Kathy, Rob, Michelle, Mike, and Judy gave good consideration to Kearns for the shares they received. Although they presented evidence, and indeed documentary evidence, indicating that they gave good and valu-

able consideration, the history of this family, as shown herein, casts grave doubt on any testimony they give or any documents they produce. The whole web of confusion surrounding the promissory note payable to Patricia for $50,000 which Kathy used as her consideration for stock is highly questionable. There have been so many stories about this note by so many different family members that this Court is unable to decide what the truth is. The Court finds that the most credible evidence on the subject are the reports that Kearns was furnishing to Chrysler at the time and the original subordination agreement with Chrysler that Kathy changed when the capital loan was obtained on August 11, 1989, i.e., that the $50,000 was actually owed by Kearns to the Debtor, and not to Steven or Patricia. That being the case, the $50,000 promissory note payable to Patricia and ostensibly purchased by Kathy did not constitute adequate consideration for Kathy's shares because the note properly belonged to the Chapter 7 Trustee as part of the Debtor's bankruptcy estate.

Mike and Judy's consideration consisted of a $50,000 promissory note which they surrendered to Kearns which consisted of the $25,000 Mike loaned to Kearns on September 26, 1998, and his $25,000 "signing bonus" of $25,000. This Court rejects as not credible Mike's testimony about this $25,000 "signing bonus" because (1) there was no writing indicating that he was entitled to this extra $25,000 and Rob, who owned 25% of the stock and was Vice President of Kearns at the time, knew nothing of this deal; (2) he did not report this $25,000 on his personal tax returns until a day or two before his deposition in this litigation; (3) he was only being paid interest on the initial $25,000, not on the entire $50,000; and (4) it was shown only as a $25,000 loan on Kearns books and in the reports sent to Chrysler. In Plaintiff's Exhibit OOOOO, the financial report to Chrysler for the period ending August 31, 1988, there was an entry of $30,000 for notes payable shown under Current Liabil-

ities. In the report for the period ending September 30, 1988, it shows notes totaling $55,000 under Current Liabilities. This increase was the $25,000 from Mike.

Thus, Mike and Kathy did not pay the full value for their shares. This was in direct contravention of the Colorado Corporation Code, C.R.S. § 7–4–105, in effect at the time and Article XV, § 9 of the Colorado Constitution and resulted in the issuance of "watered stock." *Burch v. Exploration Data Consultants, Inc.,* 33 Colo. App. 155, 518 P.2d 288 (1973). And such stock issued in violation of C.R.S. § 7–4–105 and Article XV, § 9 of the Colorado Constitution, is, *ipso facto,* invalid. *Arkansas River Land Co. v. Farmers' Loan Co.,* 13 Colo. 587, 22 P. 954 (1889).

Apparently, the Lileys did pay the book value for their new shares in the restructure as was discussed, *supra.* How and where they got the $33,332 is still questionable, but the records seem to bear out the fact that they paid this amount to Kearns in the restructure.

Plaintiffs argue that the Chapter 7 Trustee is barred from challenging the restructure because of the statutes of limitations and because of laches.

An action under 11 U.S.C. § 549 may not be commenced after two years after the date of the transfer sought to be avoided. 11 U.S.C. § 549(d)(1).

C.R.S. § 13–80–102(1) specifies that tort actions and all other actions of every kind for which no other period of limitation is provided "shall be commenced within two years after the cause of action accrues." The Colorado courts have denominated a claim by a shareholder alleging a denial of his preemptive rights as one of "wrongful conversion of [plaintiff's] property." Thus, under state law it would appear that this two-year statute of limitation would apply to the Chapter 7 Trustee's claims for denial of his preemptive rights.

But the Chapter 7 Trustee has also asserted that the dilution of the bankruptcy

estate's interest in Kearns was a fraudulent transfer which he can avoid pursuant to 11 U.S.C. § 544 and C.R.S. § 38–10–117 (in effect on the date of the restructure). This would invoke a different statute of limitation, i.e., C.R.S. § 13–80–101(c) which provides a three-year period for the commencement of all actions for "fraud, misrepresentation, concealment or deceit."

The Chapter 7 Trustee asserts that these various statutes of limitations should not be enforced under the doctrine of equitable tolling.

 In bankruptcy actions where a transaction is actively concealed by the debtor and/or the defendant, § 546(a)(1) and § 549(d)(1) are tolled until there is discovery of the fraud. In such instances there is no obligation on the part of the trustee to use due diligence to discover the fraud. *In re Pomaville*, 190 B.R. 632 (Bankr.D.Minn.1995). Such active concealment can include efforts by the debtor and/or the defendant to mislead the trustee through false responses to discovery, or by making assurances that the subject transaction is not unusual nor suspicious. *In re Candor Diamond Corp.*, 76 B.R. 342 (Bankr.S.D.N.Y.1987). And a debtor's fraudulent concealment may be imputed to other defendants for purposes of equitable tolling. *In re Pomaville, supra.*

 In the absence of active concealment, the trustee must prove that he could not uncover the claim within the limitations period despite the exercise of due diligence. But what constitutes due diligence is limited by the circumstances of the case, and specifically by economic exigencies. *In re Levy*, 185 B.R. 378 (Bankr. S.D.Fla.1995).

 And in addition to active or negligent concealment, "extraordinary circumstances" may by sufficient to invoke equitable tolling. *In re M & L Business Machine Company, Inc. (II)*, 75 F.3d 586. Such extraordinary circumstances may include the pendency of other legal proceedings which prevent enforcement of the subject claim, particularly if such other legal proceedings are perpetuated by the defendants in the instant action. *In re M & L Business Machines, Inc. (I)*, 153 B.R. 308 (D.Colo.1993), *cited with approval by In re M & L Business Machine Company, Inc. (II)*, 75 F.3d at 591.

 In this case there was active concealment of the restructure of Kearns by the Debtor. The Chapter 7 Trustee testified that from day one the Debtor kept telling him that the stock had no value. The Debtor showed on his schedules that he personally owned the stock when in fact it was owned by the Trust which he failed to disclose. The Debtor testified that the stock was fully encumbered by Chrysler, when it now appears that Chrysler may not have been secured in the stock at all. First, the owner of the stock was the Trust, yet the stock pledge was only signed by the Debtor and his wife in their individual capacity. Second, Chrysler may never have been given physical possession of the stock and that may be why Chrysler representatives later said it was "lost." Mr. DePetro told the Chapter 7 Trustee on November 16, 1992 (when the capital loan was still outstanding) that the stock certificates were then being held by the attorney John Kearns. (Plaintiffs' Ex. JJJ, p. 9.) Mr. DePetro also told him November 16, 1992, that the Trust had no assets! As late as November 6, 1996, Mr. Saltzman, a CPA hired by the Chapter 7 Trustee, reported to the Chapter 7 Trustee (Plaintiff's Ex. ZZZZ) as follows:

I have received *all* [emphasis added] of the requested corporate minutes from J. Matthew DePetro, Esq. And after reviewing them call the following to your attention:

- The last issuance of stock where consideration was noted in the minutes was on March 1, 1986. The company

issued 21,692 shares of common stock in exchange for the cancellation of loans due Lloyd J. Dreiling [Debtor] through February 28, 1996 in the amount of $100,000. This equates to $4.61 per share.

Obviously he was not given "all" of the corporate minutes by Mr. DePetro, especially the ones dated November 21, 1990, authorizing the restructure and the issuance of shares to Kathy, the Abshers and the Lileys. (Plaintiff's Ex. NNNNN.)

Throughout the bankruptcy case and the underlying adversary proceedings the actions taken by the Debtor and his family members and their attorneys were best described by Judge Brooks as "bobbing and weaving." (Case No. 89 B 14174 A, 7/11/97.) They pursued a vigorous, bitter defense of an adversary proceeding when the only thing at stake was the worthless stock of DTC and worthless life insurance policies. And all the while they maintained that DTC was an on-going operating entity. This caused the Chapter 7 Trustee to incur over $23,000 in legal fees which have still not been paid because there have never been any assets available in the estate to pay them. They remained silent when they should have spoken or they misled at every opportunity. They delayed for a full year in complying with Judge Brooks' order to issue the Kearns stock to the Chapter 7 Trustee. In addition, the Debtor knew he was in bankruptcy, his family and associates knew he was in bankruptcy, Chrysler and Chrysler's attorney (as admitted in the trial herein) knew he was in bankruptcy, Kearns' attorney knew he was in bankruptcy, and the Debtor's attorney at the time knew he was in bankruptcy. But no one gave notice to the Trustee that this restructure was contemplated or that it had been accomplished. It was all kept secret. And the

list goes on and on. If this is not active concealment then there can never be a case showing active concealment. And for what purpose? Well so far the Debtor still receives, albeit indirectly, substantial income and benefit from Kearns, i.e., all of his living expenses, including a house and a country club membership and two new cars to drive at no cost. His mountain cabin, which he still uses, and an 80–acre Kansas farm are now safely in the name of his children and the only lien on these is the one his daughter Kathy now holds. He has no assets in his name so his creditors have nothing to attach even though his discharge was denied. From all outward appearances this bankruptcy has done little, if anything, to diminish his standard of living.

Of course, the statute of limitations would begin to run whenever the Chapter 7 Trustee became aware of the restructure. Plaintiffs in this case tried to show that the Chapter 7 Trustee was dilatory in performing his duties. They spent a lot of time trying to prove when he first learned certain facts, e.g., when did he learn of the Trust; when did he learn that the Trust was self-settled; when did he learn the Trust was revocable; and when did he learn that Kearns and Denver Jeep Eagle were one and the same.[9] But these matters are irrelevant to the issue here, i.e., when did the Chapter 7 Trustee learn of the restructure?

The only thing the Plaintiffs could point to on this issue are some handwritten notes of the Chapter 7 Trustee (Plaintiff's Ex. JJJ, p. 3) which read as follows:

" 1991

Chrysler also made loan of $500,000

floor plan over $2,000,000

credit over $500,000

---

9. The parties raised these same arguments of lack of due diligence by the Chapter 7 Trustee in Adversary 92–2174 PAC and Judge Clark rejected them in her Order on Motions to dismiss entered 9/1/93.

Kearns now Denver Jeep Eagle

value of stock pledged

in 1988 worth $100,000 stock worth less now.

he claims no relationship w/ Denver Jeep Eagle

except that he pledged the stock

*he now owns 44%*

when the name was changed to Denver Jeep Eagle, officers & directors also changed.

When changed from Kearns to Denver Jeep Eagle

75% — > 44%"

The Debtor's counsel implied that this note was written November 11, 1992, because page 1 of Plaintiff's Ex. JJJ bears that date and page 9 bears the date November 16, 1992.[10] But the Chapter 7 Trustee could not verify that this page 3 was written that same date. Plaintiffs' counsel attempted to add credence to his argument that this page 3 was written on November 12,. 1992, by asserting that these pages appear and are numbered in the same sequence they were found in the Chapter 7 Trustee's file. Debtor's counsel stated that he assumed "Mr. DePetro who put it together can represent to the Court whether this is in the exact sequence..." Mr. DePetro's response was as follows:

> Yes, Judge. Mr. Cimino's file had obviously matters on the left and the right and we tried to break that down specifically along those lines since it had been objected to when we subpoenaed Mr. Cimino for the file, we asked that he

bring his original Trustee's file from which this was gathered. *Initially, we just had everything kind of jumbled and you couldn't tell what side of it it came from and what side it didn't. We had to have it recopied for that very specific purpose.* [Emphasis added].

The language emphasized, *supra,* is an admission that everything was "jumbled" and, therefore, this Court has no certainty of the original sequence of the documents in the Chapter 7 Trustee's file. When pages 2 through 8 are examined there is nothing to indicate that they were written in any particular sequence. In fact, page 7 is dated November 11, 1992, a date prior to page 1. So even if the exhibit does represent the exact sequence these documents were found in the original file, there is nothing to indicate that they were kept in a chronological fashion. In addition, as is obvious from other matters discussed herein, this Court is now quite reluctant to take Mr. DePetro's statements at face value. From this evidence the Court cannot determine on what date page 3 was written let alone conclude that it was written on November 11, 1992.

The Plaintiffs also point to the letter written by Mr. Gentry (Chrysler's attorney) on October 31, 1990. (Plaintiff's Ex. RR and WWW.) The Chapter 7 Trustee had a copy of that letter available to him at the time of the trial in Adversary No. 92–2174 PAC which commenced April 21, 1994. The letter was marked as an exhibit for the Chapter 7 Trustee in that case. This letter, directed to Chrysler, stated as follows:

> John Kearns has reported the following restructuring of the capitalization of Kearns Motor Company *will be* [emphasis added] as follows:

---

10. The page numbers referred to were affixed to the document by counsel when then they prepared the exhibit. The Chapter 7 Trustee did not affix these page numbers.

Present Structure

| | |
|---|---|
| Lloyd and Dorothy Dreiling Trust | 52,566 shares = 75% |
| Robert Liley | 17,523 Shares = 25% |

Proposed

| | |
|---|---|
| Cathy Dreiling | 19,048 Shares = 15.75% |
| Mike Absher | 19,048 Shares = 15.75% |
| Robert Liley | 30,221 Shares = 25.00% |
| Lloyd and Dorothy Dreiling Trust | 52,566 Shares = 43.50% |

This, assert the Plaintiffs, is proof that the Chapter 7 Trustee knew about the restructure at least as of April 21, 1994. However, the letter does not say that the restructure had already taken place. It says that the restructure *will be* as indicated. The Chapter 7 Trustee, having the rights of the majority shareholder, would have been justified in believing that he would be notified directly of such a restructure before finalization of the transaction so that he could have a vote in the matter, especially in light of the language on the next page which reads as follows:

> Mr. Kearns was not aware of any prohibitions in the Articles of Incorporation or Bylaws which would prevent this restructuring *although he is, at my suggestion, looking into preemptive right which may be attached to the shares which would require waivers by Rob and the Dreiling Trust.* [Emphasis added.]

This is not notice of the restructure, but only notice that a restructure was being contemplated.

■■■■ Is the Chapter 7 Trustee bound by the stock transfer restriction? Under both the Colorado Uniform Commercial Code and the Colorado Corporate Code, a restriction on the transfer of a security imposed by the issuer, even if otherwise lawful, is ineffective against a person without knowledge of the restriction unless the restriction is noted conspicuously on the security certificate. C.R.S. §§ 4–8–204[11] and 7–106–208(2). *See also, Age Publishing Company v. Becker,* 110 Colo. 319, 134 P.2d 205 (1943). These sections impose a strict requirement on the issuer to provide notice of any transfer restrictions, and do not require any independent inquiry by the holder of the certificate. *Edina State Bank v. Mr. Steak, Inc.,* 487 F.2d 640, 642 (10th Cir.1973), *cert. denied* 419 U.S. 883, 95 S.Ct. 150, 42 L.Ed.2d 123 (1974), C.R.S. §§ 7–106–207 and 208. Moreover, because these provisions were intended to protect innocent purchasers of stock from burdensome restrictions on their ability to sell the stock of which they were not given actual notice, only actual notice will suffice to overcome the effect of the statutes. *Irwin v. West End Development Company,* 342 F.Supp. 687, 696–697 (D.Colo.1972).

Here, the Chapter 7 Trustee testified that he had no notice of these restrictions until September 25, 1998, seven days before the trial herein, when he received Certificate 18. Prior to that time, specifically from March 6, 1986 (3½ years prior to the Debtor's bankruptcy), EVERY OUTSTANDING STOCK CERTIFICATE was devoid of any such stock transfer restriction as required by the By–Laws. However, on or about November 6, 1996, Mr. Saltzman, the CPA hired by the Chapter 7

---

**11.** Elsewhere, the Code makes clear that shares of stock issued by a closely-held corporation are securities subject to this section.

*See* C.R.S. §§ 4–8–102(a)(4) and 103(a), and the official comments thereto.

Trustee, sent a copy of Article IV, § 5 of the By–Laws to him along with a letter stating, *inter alia,*

> ● The By–Laws of Jack Kearns Motor Co, Section 5, contains a restrictive stock provision relating to transfer, assignment or gift to a member of the immediate family of such shareholder. You should review this as to whether stock was disposed of contrary to this provision. I am enclosing a copy of Section 5 for your review.

By-laws are contractual in nature and general contract law applies. Under general contract law a party can waive a provision of the contract if it is a provision for his benefit. Here the benefit of the stock transfer restriction is for the benefit of all the shareholders, and, as such, the shareholders may waive the restriction. *Grand Valley Irr. Co. v. Fruita Imp. Co.,* 37 Colo. 483, 86 P. 324 (1906). Such a waiver can be by abandonment and it must be unambiguous and manifest the intention not to assert the benefit. *Richmond v. Grabowski,* 781 P.2d 192 (Colo. App.1989). And a contractual right will be deemed waived if the beneficiary has acted inconsistently with it. *Vessels Oil & Gas Co. v. Coastal Refining & Marketing,* 764 P.2d 391 (Colo.App.1988). Here the Debtor and his wife ignored the restriction when they pledged and assigned the stock to Chrysler, as did all of the individual Plaintiffs when they pledged their stock to Chrysler. It seems that this restriction was honored only in the breach. No one, from March 6, 1986, to September 25, 1998, saw fit to make sure that the transfer restriction was placed on the outstanding stock certificates. Only when the individual Plaintiffs saw the possibility that the Trustee might gain some advantage did THEY give him notice of the restriction. And these were the people on the inside. They had access to, and custody of, the books and records of the corporation, including the original By–Laws and Articles of Incorporation. So they knew of the restriction but only asserted their rights when the Chapter 7 Trustee sought court permission to begin marketing the shares. They chose to ignore the By–Laws when it was to their benefit, i.e., to obtain loans from Chrysler, but now seek to enforce the critical provision when the Trustee has a claim for the stock. I find that the individual Plaintiffs' actions, and the actions of the Debtor and his wife and the Lileys, over many years, constitute an abandonment and waiver of the stock transfer restriction as it applies to the stock in the hands of the Chapter 7 Trustee.

But the question remains as to whether, even if the restriction was waived and abandoned by the Debtor, his wife, and the individual Plaintiffs, the statute of limitations bar the Chapter 7 Trustee from asserting this waiver and abandonment? I find that the statute of limitations does not bar the Chapter 7 Trustee from making this assertion. When the Debtor filed his bankruptcy petition, these shares of Kearns stock, by operation of law, became the property of the bankruptcy estate. At that point in time the Chapter 7 Trustee's rights in and to this stock became fixed. Even if the Debtor had at that time turned the stock certificates over to the Chapter 7 Trustee, those outstanding certificates representing the 52,566 shares in question did not contain the appropriate stock transfer restriction. The Chapter 7 Trustee was not bound by the restriction because at that time he had no actual notice of the restriction. Thus, the Chapter 7 Trustee could be secure in the belief that he was not bound by the restriction and had no need to seek adjudication of that issue. It was the Plaintiffs herein who brought up the issue, but only after Judge Brooks had ordered the stock turned over to the Chapter 7 Trustee, who then sought permission to begin marketing the stock.

If the Court were to hold that the Chapter 7 Trustee could not assert waiver

and abandonment within two years after he discovered the existence of the restriction, then the statute, C.R.S. § 7–106–208(1), which requires the restriction to be noted on the certificate, could always be nullified by insiders. They would only need to allow the certificates to be freely traded and held for years by innocent purchasers and then confront the holders with notice of the restriction when the innocent holders attempted to sell. No, the correct time to determine if a stock restriction remains valid against a party is at the time the party first acquires the certificate or shortly before that time. One cannot let a transfer of the shares take place and then, years later, jump up and say "Oh, by the way, I'm now telling you about the restriction and, thus, you have knowledge, and therefore the restriction applies to you."

Therefore, I find that the stock transfer restriction does not apply to the Chapter 7 Trustee because the Plaintiffs, the Debtor, and his wife, have waived and abandoned such restriction and because at the time the Chapter 7 bankruptcy estate became the owner of such shares no restriction appeared on any of the outstanding certificates and the Chapter 7 Trustee did not have actual notice of the restriction.

 Although it appears that the Lileys paid the book value of the stock for the shares they received in the restructure, it also appears that Rob Liley breached his fiduciary duty to the Chapter 7 Trustee as the owner of the shares previously held by the Debtor. At the time of the restructure Rob was a director, a 25% shareholder, and the chief operating officer and Vice President of Kearns. As such he had a fiduciary duty to deal fairly with the other shareholder, the Chapter 7 Trustee. *Van Schaack v. Van Schaack Holdings, Ltd.*, 856 P.2d 15 (Colo.App.1992). These fiduciary duties included the duty to act with an extreme measure of candor, unselfishness, and good faith because his office was one of trust, and he, therefore,

had a higher standard of duty required of trustees. *River Management Corp. v. Lodge Properties, Inc.*, 829 P.2d 398 (Colo. App.1991). By failing to notify the Chapter 7 Trustee of the proposed restructure and thus affording him the opportunity to exercise his pre-emptive rights, while insuring that Rob himself maintained his 25% ownership interest, Rob violated the trust imposed upon him. He also participated in the illegal corporate actions described *supra* where parties who were not eligible increased the authorized shares and where parties assumed the role of directors when they had no right to do so.

The individual Plaintiffs assert that the doctrine of laches should be invoked because they have worked long and hard to build up the business of Kearns and because they have gone out on a limb and personally guaranteed the loans to Chrysler. All the while they assert that the Chapter 7 Trustee has done nothing to help the company and has not even requested to participate in the operations and management of Kearns, nor has he guaranteed any of the loans. Thus, they claim, it would be generally inequitable for the Chapter 7 Trustee to come in now and receive the "windfall" of their efforts.

 Laches is an equitable doctrine. A party asserting the benefits of that doctrine must prove three things: (1) the offending party must have had full knowledge of the facts; (2) the offending party must have unreasonably delayed in the assertion of his available remedies; and (3) there must have been an intervening reliance by or prejudice to the other party. *City of Thornton v. Bijou Irrigation Co.*, 926 P.2d 1 (Colo.1996).

 The individual Plaintiffs have failed to carry their burden on all three elements. First, the Chapter 7 Trustee did not have full knowledge of the facts. As set forth, *supra*, the facts were hidden and concealed from him by these individual Plaintiffs and their attorneys. Second, the

Chapter 7 Trustee did not unreasonably delay in bringing his claims once he knew the true facts. Third, the individual Plaintiffs have been very well compensated for their efforts in operating the business. They have received more than $200,000/ year including substantial bonuses in the last few years. The earlier years after the restructure they received compensation commensurate with the success of the company. They have each (Rob, Kathy, and Mike) received the use of four new cars every year, all expenses paid. In fact, their own evidence was that they were adequately compensated, but not overly compensated, for their efforts.

■ The individual Plaintiffs argue that under general equitable standards it would be unfair for the Chapter 7 Trustee to share in the results of all their hard work. However, stockholders, even though they have not been employed by the corporation, nevertheless are entitled to share in the profits of the company and to enjoy the enhancement of the value of the corporation. *People v. Westfall*, 185 Colo. 110, 522 P.2d 100 (1974). There is nothing inequitable in the Chapter 7 Trustee's being able to capitalize on the increased value of the stock for the benefit of the creditors of the Debtor's bankruptcy estate. It is no different than a situation where a bankruptcy trustee holds stock in IBM, or General Motors, or Microsoft, and because of general market conditions and the successful operation of the corporation, he sells the stock at a value higher than it was when it came into the bankruptcy estate. In such a situation can the officers and directors of IBM complain that this increase in value is due solely to their efforts and the bankruptcy trustee should not be entitled to reap the benefits of their labor? Of course not.

The Chapter 7 Trustee asserts that he is entitled to damages based on the actions of the individual Plaintiffs, claiming that they have received too much in the way of compensation. However, except as to the compensation received by Kathy, the Chapter 7 Trustee has failed in his proof on that issue. The Chapter 7 Trustee also seeks monetary damages for the diminution of the value of his shares after the restructure. However, he has not carried his burden on the measure of those damages, i.e., the before and after value of the 52,566 shares. However, because of the remedy the Court will fashion in this case, the Chapter 7 Trustee would not be entitled monetary damages for this claim.

Based on the foregoing, it is

■ ORDERED, ADJUDGED, AND DECREED that the Plaintiffs and the Debtor Third–Party Defendant, and each of them, wrongfully deprived the Defendant Chapter 7 Trustee of his pre-emptive rights as the holder of shares of stock in Kearns Motor Company, Inc., and that the proper remedy is to force Kearns Motor Company, Inc., and its officers, directors, employees, agents and attorneys, to cancel the shares of stock issued on or about November 21, 1990, to Robert and Michelle Liley, Mike and Judy Absher, and Kathy Dreiling. The other remedy of allowing the Chapter 7 Trustee to buy additional shares at the same price allegedly paid by the individual Plaintiffs would be ineffective because the bankruptcy estate has no funds to realize on that remedy. It is

FURTHER ORDERED, ADJUDGED, AND DECREED that the Defendant, John A. Cimino, as Chapter 7 Trustee in the case of *In re Lloyd J. Dreiling*, Case No. 89 B 14174 A, is the owner of 75% of the outstanding shares of stock in Kearns Motor Company, Inc., and that these shares are not subject to the stock transfer restriction set forth in Article IV, § 5 of the By–Laws of Kearns Motor Company, Inc. It is

FURTHER ORDERED, ADJUDGED, AND DECREED that each party herein shall bear its own costs, PROVIDED

HOWEVER, that Kearns Motor Company, Inc., is prohibited from paying the attorney's fees, costs, and expenses of the individual Plaintiffs herein, and of the Debtor Third–Party Defendant, unless and until such fees and costs may be approved for payment by a properly constituted Board of Directors of Kearns Motor Company, Inc., elected by the majority of shares outstanding, including the shares held by the Chapter 7 Trustee comprising 75% thereof.